UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JAMAR HAYNES, SCOTT WHITEHILL, MATTHEW BROWNLEE, BENJAMIN BISCHOFF, STEPHEN LESZCZYNSKI, CASSANDRA MORRISON, ROBERT RANEY, and DAVID POLLEY, individually and on behalf of all others similarly situated, | Case No. 2:19-cv-12427 |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| FORD MOTOR COMPANY, a Delaware corporation, | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

010825-11/1171942 V1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................. 1

II. JURISDICTION ................................................................. 7

III. VENUE ............................................................................ 9

IV. PARTIES ......................................................................... 9

    A. Plaintiffs ................................................................. 9

        1. Jamar Haynes – Georgia ............................................ 9

        2. Cassandra Morrison – Illinois .................................... 11

        3. Benjamin Bischoff – Louisiana ................................... 13

        4. Scott Whitehill – Nebraska ........................................ 14

        5. David Polley – Ohio ................................................... 16

        6. Matthew Brownlee – South Carolina ............................ 18

        7. Robert Raney – South Dakota ..................................... 19

        8. Stephen Leszczynski – Wisconsin ................................ 21

    B. Defendant ............................................................... 23

        1. Ford Motor Company ................................................. 23

V. FACTUAL ALLEGATIONS ............................................... 23

    A. Coastdown testing ..................................................... 23

    B. The coastdown results are used to create fuel economy information posted on vehicles' windows and used in advertising. ............................................................... 26

    C. Ford admits improper coastdown testing. ...................... 31

        1. 2019 Ranger ............................................................ 31

    D. CAFE standards provide manufacturers with credits for low emissions. ............................................................... 35

E.   Criminal investigation ...................................................... 41

F.   Mechanism of coastdown cheating ................................... 42

G.   F-150 test results .............................................................. 46

H.   Ford's History of Cheating............................................... 55

I.   Ford advertising for the Ranger emphasizes fuel economy............. 57

J.   Ford promotes the F-150 as best in class for fuel economy or publishes MPG estimates to beat its competition. ........................... 58

K.   Economic harm.................................................................. 67

VI.   TOLLING OF THE STATUTE OF LIMITATIONS ................................. 67

A.   Discovery rule tolling....................................................... 67

B.   Fraudulent concealment tolling........................................ 68

C.   Estoppel ............................................................................ 69

VII.   CLASS ALLEGATIONS .......................................................... 69

COUNT 1 VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT (GA. CODE ANN. § 10-1-390 *ET SEQ.*).................. 73

COUNT 2 VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT (GA. CODE ANN § 10-1-370 *ET SEQ.*) ............................................................................... 74

COUNT 3 BREACH OF CONTRACT (BASED ON GEORGIA LAW)........... 75

COUNT 4 FRAUDULENT CONCEALMENT (BASED ON GEORGIA LAW)...................................................................................... 77

COUNT 5 VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A) .................................. 82

COUNT 6 BREACH OF CONTRACT (BASED ON ILLINOIS LAW)........... 86

COUNT 7 FRAUDULENT CONCEALMENT (BASED ON ILLINOIS LAW)...................................................................................... 88

COUNT 8 VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION LAW (LA.
REV. STAT. § 51:1401 *ET SEQ.*) ................................................. 93

COUNT 9 BREACH OF CONTRACT (BASED ON LOUISIANA
LAW) ........................................................................................... 95

COUNT 10 FRAUDULENT CONCEALMENT (BASED ON
LOUISIANA LAW) ...................................................................... 97

COUNT 11 VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT (NEB. REV. STAT. § 59-1601 *ET SEQ.*) ............. 102

COUNT 12 BREACH OF CONTRACT (BASED ON NEBRASKA
LAW) ........................................................................................... 103

COUNT 13 FRAUDULENT CONCEALMENT (BASED ON
NEBRASKA LAW) ...................................................................... 105

COUNT 14 VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT (OHIO REV. CODE ANN. § 1345.01
*ET SEQ.*) .................................................................................... 105

COUNT 15 BREACH OF CONTRACT (BASED ON OHIO LAW) .............. 108

COUNT 16 FRAUDULENT CONCEALMENT (BASED ON OHIO
LAW) ........................................................................................... 110

COUNT 17 VIOLATION OF THE SOUTH CAROLINA UNFAIR
TRADE PRACTICES ACT (S.C. CODE ANN. § 39-5-10
*ET SEQ.*) .................................................................................... 115

COUNT 18 BREACH OF CONTRACT (BASED ON SOUTH
CAROLINA LAW) ...................................................................... 116

COUNT 19 FRAUDULENT CONCEALMENT (BASED ON SOUTH
CAROLINA LAW) ...................................................................... 117

COUNT 20 VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(S.D. CODIFIED LAWS § 37-24-6) ............................................ 123

COUNT 21 BREACH OF CONTRACT (BASED ON SOUTH
DAKOTA LAW) .......................................................................... 123

COUNT 22 FRAUDULENT CONCEALMENT (BASED ON SOUTH
DAKOTA LAW)..................................................................... 125

COUNT 23 VIOLATION OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT (WIS. STAT. § 110.18)............................. 130

COUNT 24 BREACH OF CONTRACT (BASED ON WISCONSIN
LAW).................................................................................... 131

COUNT 25 FRAUDULENT CONCEALMENT (BASED ON
WISCONSIN LAW)............................................................... 133

    A.    Claims brought on behalf of the other state classes ....................... 138

COUNT 26 VIOLATION OF THE ALABAMA DECEPTIVE TRADE
PRACTICES ACT (ALA. CODE § 8-19-1 *ET SEQ.*) ............................. 138

COUNT 27 VIOLATION OF THE ALASKA UNFAIR TRADE
PRACTICES AND CONSUMER PROTECTION ACT (ALASKA
STAT. ANN. § 45.50.471 *ET SEQ.*) ......................................... 140

COUNT 28 VIOLATION OF THE ARIZONA CONSUMER FRAUD
ACT (ARIZONA REV. STAT. § 44-1521 *ET SEQ.*) .............................. 141

COUNT 29 VIOLATION OF THE ARKANSAS DECEPTIVE TRADE
PRACTICES ACT (ARK. CODE ANN. § 4-88-101 *ET SEQ.*).............. 143

COUNT 30 VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200
*ET SEQ.*) ................................................................................. 144

COUNT 31 VIOLATIONS OF THE CALIFORNIA FALSE
ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500
*ET SEQ.*) ................................................................................. 148

COUNT 32 VIOLATION OF THE COLORADO CONSUMER
PROTECTION ACT (COLO. REV. STAT. § 6-1-101 *ET SEQ.*)........... 152

COUNT 33 VIOLATION OF THE CONNECTICUT UNFAIR TRADE
PRACTICES ACT (CONN. GEN. STAT. § 42-110A *ET SEQ.*)............ 153

COUNT 34 VIOLATION OF THE DELAWARE CONSUMER FRAUD
ACT (DEL. CODE TIT. 6, § 2513 *ET SEQ.*).......................... 154

COUNT 35 VIOLATIONS OF THE FLORIDA UNFAIR AND
DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201
*ET SEQ.*) ................................................. 155

COUNT 36 VIOLATION OF THE HAWAII ACT § 480-2(A) (HAW.
REV. STAT. § 480 *ET SEQ.*) .................................. 159

COUNT 37 VIOLATION OF THE IDAHO CONSUMER
PROTECTION ACT (IDAHO CODE ANN. § 48-601 *ET SEQ.*)........... 160

COUNT 38 VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT (IND. CODE § 24-5-0.5-3)........................ 162

COUNT 39 VIOLATION OF THE IOWA PRIVATE RIGHT OF
ACTION FOR CONSUMER FRAUDS ACT (IOWA CODE
§ 714H.1 *ET SEQ.*) .................................... 164

COUNT 40 VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT (KAN. STAT. ANN. § 50-623 *ET SEQ.*).............. 165

COUNT 41 VIOLATIONS OF THE KENTUCKY CONSUMER
PROTECTION ACT (KY. REV. STAT. § 367.110 *ET SEQ.*)................ 166

COUNT 42 VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT (ME. REV. STAT. ANN. TIT. 5, § 205-A
*ET SEQ.*) .................................... 170

COUNT 43 VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101
*ET SEQ.*) .................................... 171

COUNT 44 VIOLATION OF THE MASSACHUSETTS GENERAL
LAW CHAPTER 93(A) (MASS. GEN. LAWS CH. 93A, § 1,
*ET SEQ.*) .................................... 172

COUNT 45 VIOLATION OF THE MICHIGAN CONSUMER
PROTECTION ACT (MICH. COMP. LAWS § 445.903 *ET SEQ.*) ....... 172

COUNT 46 VIOLATION OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT (MINN. STAT. § 325F.68 *ET SEQ.*)......... 174

COUNT 47 VIOLATION OF THE MINNESOTA DECEPTIVE
TRADE PRACTICES ACT (MINN. STAT. § 325D.43-48
*ET SEQ.*) .................................... 175

COUNT 48 VIOLATION OF THE MISSISSIPPI CONSUMER
PROTECTION ACT (MISS. CODE. ANN. § 75-24-1 *ET SEQ.*)........... 176

COUNT 49 VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT (MO. REV. STAT. § 407.010, *ET SEQ.*) ................ 177

COUNT 50 VIOLATION OF THE MONTANA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT OF 1973
(MONT. CODE ANN. § 30-14-101 *ET SEQ.*) ........................................ 181

COUNT 51 VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT (NEV. REV. STAT. § 598.0903 *ET SEQ.*) .............. 182

COUNT 52 VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
PROTECTION ACT (N.H. REV. STAT. ANN. § 358-A:1
*ET SEQ.*) ............................................................................................... 184

COUNT 53 VIOLATION OF THE NEW JERSEY CONSUMER
FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*) ............................. 185

COUNT 54 VIOLATION OF THE NEW YORK GENERAL
BUSINESS LAW (N.Y. GEN. BUS. LAW §§ 349–350) ....................... 186

COUNT 55 VIOLATION OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT (N.M. STAT. ANN. § 57-12-1 *ET SEQ.*) ................. 188

COUNT 56 VIOLATION OF THE NORTH CAROLINA UNFAIR
AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN.
STAT. § 75-1.1 *ET SEQ.*)......................................................................... 189

COUNT 57 VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT (N.D. CENT. CODE § 51-15-02) ..................................... 190

COUNT 58 VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT (OKLA. STAT. TIT. 15, § 751 *ET SEQ.*)............. 191

COUNT 59 VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT (OR. REV. STAT. § 646.605 *ET SEQ.*) ................... 193

COUNT 60 VIOLATION OF THE PENNSYLVANIA UNFAIR
TRADE PRACTICES AND CONSUMER PROTECTION LAW
(73 PA. CONS. STAT. § 201-1 *ET SEQ.*) ............................................... 194

COUNT 61 VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
    PRACTICES AND CONSUMER PROTECTION ACT (R.I. GEN.
    LAWS § 6-13.1 *ET SEQ.*) ........................................................................ 196

COUNT 62 VIOLATION OF TENNESSEE CONSUMER
    PROTECTION ACT (TENN. CODE § 47-18-101, *ET SEQ.*) ................ 197

COUNT 63 VIOLATIONS OF THE TEXAS DECEPTIVE TRADE
    PRACTICES AND CONSUMER PROTECTION ACT (TEX.
    BUS. & COM. CODE § 17.4 *ET SEQ.*) ..................................................... 201

COUNT 64 VIOLATION OF THE UTAH CONSUMER SALE
    PRACTICES ACT (UTAH CODE ANN. § 13-11-1 *ET SEQ.*) .............. 205

COUNT 65 VIOLATION OF THE VERMONT CONSUMER FRAUD
    ACT (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*) .................................. 206

COUNT 66 VIOLATION OF THE VIRGINIA CONSUMER
    PROTECTION ACT (VA. CODE ANN. § 59.1-196 *ET SEQ.*).............. 207

COUNT 67 VIOLATION OF THE WASHINGTON CONSUMER
    PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010
    *ET SEQ.*) .................................................................................................... 208

COUNT 68 VIOLATION OF THE WEST VIRGINIA CONSUMER
    CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101
    *ET SEQ.*) .................................................................................................... 209

COUNT 69 VIOLATION OF THE WYOMING CONSUMER
    PROTECTION ACT (WYO. STAT. § 40-12-105 *ET SEQ.*) .................. 212

COUNT 70 BREACH OF EXPRESS WARRANTY ......................................... 213

COUNT 71 FRAUD ........................................................................................... 213

COUNT 72 NEGLIGENT MISREPRESENTATION ...................................... 214

COUNT 73 UNJUST ENRICHMENT............................................................... 215

REQUEST FOR RELIEF .................................................................................. 215

DEMAND FOR JURY TRIAL ......................................................................... 216

Plaintiffs, Jamar Haynes, Scott Whitehill, Matthew Brownlee, Benjamin Bischoff, Stephen Leszczynski, Cassandra Morrison, Robert Raney, and David Polley individually and on behalf of all others similarly situated (the "Class"), allege the following based upon the investigation of counsel, the review of scientific papers, and the proprietary investigation of experts.

## I.    INTRODUCTION

1.    Plaintiffs bring this class action for a Class defined as:

> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019 Ford Ranger and the 2018 and 2019 Ford F-150.

2.    These vehicles are hereinafter referred to as the "Coastdown Cheating Vehicles" and include the 2019 Ford Ranger Truck and the 2018-2019 F-150 series trucks, and likely also include other Ford vehicles.

3.    A Coastdown test is a procedure that determines metrics used to calculate a vehicle's fuel economy values or "MPG Rating."  Coastdown testing tells a manufacturer how much rolling resistance and drag a vehicle has, so that when a vehicle is testing on a dynamometer, as required by regulations, the manufacturer knows how much drag and rolling resistance to apply to the vehicle to simulate the road.

4.      Ford fudged its coastdown testing and used inaccurate drag and resistance figures to boost the vehicles' EPA mileage ratings.

5.      On the window sticker of every Ford F-150 and Ford Ranger are EPA-required indications of fuel economy including city and highway mileage, miles per gallon, and a combined city and highway miles per gallon statement. Ford knows that fuel economy is material to consumers.

6.      Testing of the 2018 F-150 using the mandated coastdown procedure reveals that Ford did not follow appropriate coastdown testing procedures.  The window sticker or "Monroney sticker" for a Ford F-150 V6 indicates mileage of 20 city, 26 highway, and 22 combined.  Accurate coastdown testing of a 2018 Ford F-150 V6 reveals the following:  The real highway fuel number is 22.7 MPG compared to 26.6 reported by Ford to the EPA.  For city driving it is 17.7 MPG compared to 19.6 reported to the EPA.  So the highway fuel difference is 15% and the city difference 10%.  Assuming the lifetime of a truck is 150,000 miles, at the real city miles per gallon rates. City driving would consume an extra 821 gallons over the lifetime of the truck, or at $2.79 national average fuel price, an extra $2,290 in fuel costs over Ford's reported miles per gallon.  The highway extra fuel (extra means real MPG versus Ford's reported MPG) is 968 gallons or $2,700.

7.      If one rounds to the Monroney sticker numbers, the math on real mileage versus Ford's reported mileage is as follows:

| | | | |
|---|---|---|---|
| Sticker Reported City Mileage: | 20 | Real City Mileage: | 18 |
| Sticker Reported Highway Mileage: | 25 | Real Highway Mileage: | 23 |
| Sticker Reported Combined Mileage: | 22 | Real Combined Mileage: | 21 |

So there is an overstatement of 10% on city mileage and 8% on highway.  That results in increased fuel costs of an extra $2,324 in city driving fuel costs, and $1,453 in highway driving fuel costs over the life of the vehicle.

8.     These are material differences as manufacturers fight for every 1/10th of a difference in miles per gallon both to attract customers and to earn credits under the applicable environmental emissions regulations.

9.     Looking at the 2018 sales of F-150s and assuming that 70% are V6 F-150s, there were 636,000 trucks sold. Total additional fuel cost for that one model year over the life of the vehicle would be $1,478,700,000 for the city fuel rating, $1,335,282,936 for the highway rating or $1,209,845,455 for the combined rating. This is damages as measured by extra fuel costs just for the 2018 Model Year for the V6 model alone.

10.     Ford's motives in overstating vehicle miles per gallon were (1) to advertise the vehicles as "Best in Class" for fuel economy or to advertise a fuel economy that would beat the competition and/or be attractive to consumers, (2) to attract customers based on fuel economy ratings, and (3) less fuel burned means less emissions, and therefore more credits for Ford under the U.S. CAFE environmental regulations.

11.     Ford has admitted that its newest model of truck, the 2019 Ranger, is just the first model that is being investigated by the government for improper coastdown testing.  As explained herein, plaintiffs' testing of the 2018 F-150 reveals similar coastdown cheating.

12.     There is no reason to assume Ford overstated mileage on just the V6 model 2018 F-150.  Ford sold over 1 million 2018 F-150s.  The extra fuel costs, with the same assumptions above, for all 2018 F-150s is $2.32 billion for city driving, $2.09 billion highway, and $1.9 billion combined.  The F-150 2019 is virtually identical in engine and body configuration.  So it is plausible the 2019 coastdown figures are also overstated.

13.     Ford deliberately misrepresented or miscalculated certain road testing factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were.  In particular, Ford miscalculated something called "Road Load," which is the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.[1]  Ford's internal lab tests did not account for these forces, which lead to better—and entirely inaccurate—fuel economy projections.

---

[1] *See* Exhibit 1, https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1.

14.     Despite Ford's own employees questioning its testing practices and the calculations that Ford was utilizing for fuel economy ratings, at least by September 2018,[2] Ford took no action to correct the problems, nor to alert consumers that their test methods were flawed and that consumers would not get the promised fuel economy.

15.     With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[3]  Ford also claimed that its "All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in America."[4]  "With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel efficient gas-powered midsize pickup in America."[5]  Ford claimed the 2019 Ranger "is the no-compromise choice for power, technology, capability, and efficiency whether the

---

[2] Exhibit 2, https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline.

[3] Exhibit 3, Statement from Todd Eckert, Ford Truck Group's Marketing Manager, https://thenewswheel.com/2019-ford-ranger-most-fuel-efficient/.

[4] Exhibit 4, https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

[5] *Id.*

path is on road or off."[6]  Ford knew that to sell the Ranger, it had to tout it had fuel efficiency, and this promise was material to consumers.

16.    There is no question that Ford used the fuel efficiency ratings as a selling tool to entice consumers into purchasing the 2019 Ford Ranger.  Indeed, Ford promised that "[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America—providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition.  The all-new Ranger has earned EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2 trucks."[7]  Ford claimed that "[t]his is the best-in-class EPA-estimated city fuel economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[8]

17.    Fuel economy was also used as a tool to entice customers to buy the Ford F-150.  Ford promised that certain of 2018 F-150s were "best in class" for fuel economy, or promised certain city, highway and combined fuel miles per gallon for other F-150 models that were robust enough that Ford believed would make them attractive to consumers.

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

18.     In contrast to Ford's promises, as noted above, scientifically valid testing has revealed that the vehicles (i) are not as fuel efficient as promised; (ii) are not what a reasonable consumer would expect; and (iii) are not what Ford had advertised. Further, the vehicles' promised power, fuel economy and efficiency, and towing capacity is obtained only by altering the testing calculations.

19.     Ford's representations are deceptive and false, and Ford sold its 2019 Ford Rangers and 2018-19 F-150 models while omitting information that would be material to a reasonable consumer, namely that Ford miscalculated factors during internal vehicle testing processes in order to report that its vehicles were more fuel efficient than they actually were, and discounting common real-world driving conditions.

20.     Plaintiffs bring this action individually and on behalf of all other current and former owners or lessees of the Coastdown Cheating Vehicles. Plaintiffs seek damages, injunctive relief, and equitable relief for Ford's misconduct related to the design, manufacture, marketing, sale, and lease of the Coastdown Cheating Vehicles, as alleged in this Complaint.

## II.     JURISDICTION

21.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiffs and Defendants reside in different states. The

Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.     This Court also has original jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a)(1), as modified by the Class Action Fairness Act of 2005, because Plaintiffs and Defendants are citizens of different states; there are more than 100 members of the Class (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and Class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

23.     This Court has personal jurisdiction over Ford pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over Ford because it has minimum contacts with the United States, this judicial district, and this State, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Ford vehicles in this State and District. At least in part because of Ford's misconduct as alleged in this lawsuit, the Coastdown Cheating Vehicles ended up on this state's roads and in dozens of franchise dealerships.

## III.   VENUE

24.     Venue is proper in this Court under 28 U.S.C. § 1391 because (i) Ford conducts substantial business in this District and has intentionally availed itself of the laws and markets of the United States and this District; and/or (ii) many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia*, Ford's decision-making, design, promotion, marketing, and distribution of the Coastdown Cheating Vehicles occurred in this District.  Ford has its headquarters and sells a substantial number of automobiles in this District, has dealerships located throughout this District, and the misconduct occurred, in part, in this District. Venue is also proper under 18 U.S.C. § 1965(a) because Ford is subject to personal jurisdiction in this District, as alleged in the preceding paragraph, and Ford has agents located in this District.

## IV.   PARTIES

### A.   Plaintiffs

#### 1.   Jamar Haynes – Georgia

25.     Plaintiff Jamar Haynes is a Georgia citizen and resident of Lawrenceville, Georgia.  In May 2019, he purchased a new 2019 Ford F-150 pickup, paying approximately $38,000.  Mr. Haynes compared the alleged fuel efficiency of the F-150 with other similar trucks and selected the F-150 truck based on Ford's representations about the vehicle's fuel efficiency.

26.     Plaintiff Haynes purchased the new 2019 F-150, with VIN 1FTEW1CP0KFA28481, from Gwinnett Place Ford, an authorized Ford dealership located in Duluth, Georgia. Plaintiff Haynes purchased and still owns this vehicle. Unbeknownst to Plaintiff Haynes at the time the vehicle was purchased, it consumes more fuel than advertised.

27.     Upon information and belief, the vehicle is also equipped with a cheat device, a computer that misrepresents the mileage displayed on the trip meter. Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff Haynes to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.

28.     Ford knew about the inaccurate fuel economy representations, computer model, physical test cheating, and the mileage cheat device included in the vehicle, but did not disclose such facts or their effects to Plaintiff Haynes, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle had better fuel economy than the competition, and would retain all of its promised fuel economy and performance throughout its useful life.

29.     Plaintiff Haynes selected and ultimately purchased his vehicle, in part, because of the stated "best in class" fuel economy.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff Haynes would not

have purchased the vehicle or would have paid less for it. Plaintiff Haynes and each Class member has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Haynes or Class members of the existence of a fuel economy cheat device or the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

**2.    Cassandra Morrison – Illinois**

30.    Plaintiff Cassandra Morrison is an Illinois citizen and resident of Chicago, Illinois.  In June 2019, she purchased a new 2019 Ford F-150 XLT SuperCrew pickup, paying approximately $44,000.  Ms. Morrison compared the alleged fuel efficiency of the F-150 with other similar trucks, including the Chevrolet Silverado, GMC Sierra, and Nissan Titan, and selected the F-150 truck based on Ford's representations about the vehicle's fuel efficiency.

31.    Plaintiff Morrison purchased the new 2019 F-150, with VIN 1FTEW1EP8KFB13355, from McCarthy Ford, an authorized Ford dealership located in Chicago, Illinois. Plaintiff Morrison purchased and still owns this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

32.    Upon information and belief, the vehicle is also equipped with a cheat device, a computer that misrepresents the mileage displayed on the trip meter.

Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff Morrison to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.

33.    Ford knew about or recklessly disregarded the inaccurate fuel economy representations, computer model, physical test cheating, and the mileage cheat device included in the vehicle, but did not disclose such facts or their effects to Plaintiff Morrison, so she purchased her vehicle on the reasonable but mistaken belief that her vehicle had better fuel economy than the competition, and would retain all of its promised fuel economy and performance throughout its useful life.

34.    Plaintiff Morrison selected and ultimately purchased her vehicle, in part, because of the stated "best in class" fuel economy.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff Morrison would not have purchased the vehicle or would have paid less for it. Plaintiff Morrison and each Class member has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations. Neither Ford nor any of its agents, dealers, or other representatives informed Plaintiff Morrison or Class members of the existence of a fuel economy cheat device or the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 3. Benjamin Bischoff – Louisiana

35.     Plaintiff Benjamin Bischoff is a Louisiana citizen and resident of Eunice, Louisiana.  In June 2018, he purchased a new 2018 Ford F-150 pickup for approximately $56,510. Mr. Bischoff compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks and selected the 2018 F-150 truck based in part on Ford's representations about the vehicle's fuel efficiency.  Mr. Bischoff purchased the 2018 F-150, with VIN 1FTEW1E52JKC7620, from Pitre Ford, an authorized Ford dealership located in Eunice, Louisiana. Mr. Bischoff purchased and still owns this vehicle.  Unbeknownst to Mr. Bischoff at the time the vehicle was purchased, it consumes more fuel than advertised.  Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Mr. Bischoff to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.  Ford knew about, or recklessly disregarded, the inaccurate fuel economy representations and the mileage cheat device included in the vehicle, but did not disclose such facts or their effects to Mr. Bischoff, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle had better fuel economy than the competition, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life.  Mr. Bischoff selected and ultimately purchased his vehicle, in part, because of the

stated fuel economy, as represented through advertisements and representations made by Ford.  Mr. Bischoff recalls that before he purchased the 2018 F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Mr. Bischoff would not have purchased the vehicle or would have paid less for it.  Mr. Bischoff and each Class member has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to, a high premium for exaggerated fuel economy, and out-of-pocket losses by overpaying for the vehicles at the time of purchase and added fuel costs. Neither Ford nor any of its agents, dealers, or other representatives informed Mr. Bischoff or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 4.  Scott Whitehill – Nebraska

36.    Plaintiff Scott Whitehill is a Nebraska citizen and resident of Omaha, Nebraska.  On or about August 30, 2018, he purchased a new 2018 Ford F-150 pickup, paying approximately $49,380.  Prior to purchasing the F-150, Mr. Whitehill compared the alleged fuel efficiency of the F-150 with other similar trucks.  Mr. Whitehill selected the F-150 truck based on Ford's representations on the window sticker about the vehicle's fuel efficiency.

37.     Plaintiff Whitehill purchased the new 2018 F-150, with VIN 1FTEWE52JKE30312, from Woodhouse Ford, an authorized Ford dealership located in Omaha, Nebraska. Plaintiff Whitehill purchased and still owns this vehicle.  Unbeknownst to Plaintiff at the time the vehicle was purchased, it consumes more fuel than advertised.

38.     Upon information and belief, the vehicle is also equipped with a cheat device, a computer that misrepresents the mileage displayed on the trip meter. Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Plaintiff Whitehill to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.

39.     Ford knew about or recklessly disregarded the inaccurate fuel economy representations, computer model, physical test cheating, and the mileage cheat device included in the vehicle, but did not disclose such facts or their effects to Plaintiff Whitehill, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle had better fuel economy than the competition and would retain all of its promised fuel economy and performance throughout its useful life.

40.     Plaintiff Whitehill selected and ultimately purchased his vehicle, in part, because of the stated fuel economy.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Plaintiff Whitehill would not

have purchased the vehicle or would have paid less for it. Plaintiff Whitehill and

each Class member has suffered an ascertainable loss as a result of Ford's

omissions and/or misrepresentations. Neither Ford nor any of its agents, dealers, or

other representatives informed Plaintiff Whitehill or Class members of the

existence of a fuel economy cheat device or the true fuel economy of the

Coastdown Cheating Vehicles prior to their lease or purchase.

### 5. David Polley – Ohio

41.     Plaintiff David Polley is a Ohio citizen and resident of Bellevue,

Ohio.  On or about December 10, 2018, he leased a new 2018 Ford F-150 pickup

paying approximately $50,205.  Mr. Polley compared the alleged fuel-efficiency of

the 2018 Ford F-150 with other similar trucks and selected the 2018 Ford F-150

truck based, in part, on Ford's representations about the vehicle's fuel-

efficiency.  Mr. Polley leased the 2018 Ford F-150 from Don Tester Ford, an

authorized Ford dealership located in Norwalk, Ohio.  Mr. Polley leased and is still

leasing this vehicle.  Unbeknownst to Mr. Polley at the time the vehicle was leased,

it consumes more fuel than advertised.  Ford's unfair, unlawful, and deceptive

conduct in designing, testing, manufacturing, marketing, and selling the vehicle

with exaggerated fuel economy caused Mr. Polley to suffer out-of-pocket loss in

the form of overpayment at the time of purchase, in addition to added fuel

costs.  Ford knew about, or recklessly disregarded, the inaccurate fuel economy

representations and the mileage cheat device included in the vehicle, but did not

disclose such facts or their effects to Mr. Polley, so he leased his vehicle on the

reasonable but mistaken belief that his vehicle had better fuel economy than the

competition, was properly-EPA certified, and would retain all of its promised fuel

economy and performance throughout its useful life.  Mr. Polley selected and

ultimately leased his vehicle, in part, because of the stated fuel economy, as

represented through advertisements and representations made by Ford.  Mr. Polley

recalls that before he leased the 2018 Ford F-150, he saw representations about the

vehicle's performance, including its fuel economy, on Ford's website and on the

vehicle's window sticker.  Had Ford disclosed the true fuel economy and dubious

certifications of the vehicle, Mr. Polley would not have leased the vehicle or would

have paid less for it.  Mr. Polley and each Class member has suffered an

ascertainable loss as a result of Ford's omissions and/or misrepresentations,

including, but not limited to, a high premium for exaggerated fuel economy, and

out of pocket losses by overpaying for the vehicle at the time of purchase and

added fuel costs. Neither Ford nor any of its agents, dealers, or other

representatives informed Mr. Polley or Class members the true fuel economy of the

Coastdown Cheating Vehicles prior to entering into the lease.

### 6.  Matthew Brownlee – South Carolina

42.     Plaintiff Matthew Brownlee is a South Carolina citizen and resident of Central, South Carolina.  In December 2018, he purchased a new 2018 Ford F-150 pickup paying approximately $45,200.  Mr. Brownlee compared the alleged fuel efficiency of the 2018 F-150 with other similar trucks and selected the 2018 F-150 truck based, in part, on Ford's representations about the vehicle's fuel efficiency. Mr. Brownlee purchased the new 2018 F-150 with VIN 1FTFW1E56JFE72902, from Fairway Ford, an authorized Ford dealership located in Greenville, South Carolina.  Mr. Brownlee purchased and still owns this vehicle.  Unbeknownst to Mr. Brownlee at the time the vehicle was purchased, it consumes more fuel than advertised.  Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Mr. Brownlee to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.  Ford knew about, or recklessly disregarded, the inaccurate fuel economy representations and the mileage cheat device included in the vehicle, but did not disclose such facts or their effects to Mr. Brownlee, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle had better fuel economy than the competition, was properly EPA-certified, and would retain all of its promised fuel economy and performance

throughout its useful life.  Mr. Brownlee selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Mr. Brownlee would not have purchased the vehicle or would have paid less for it.  Mr. Brownlee and each Class member has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to a high premium for exaggerated fuel economy, and out-of-pocket losses by overpaying for the vehicles at the time of purchase and added fuel costs.  Neither Ford nor any of its agents, dealers, or other representatives informed Mr. Brownlee or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 7.  Robert Raney – South Dakota

43.    Plaintiff Robert Raney is a South Dakota citizen and resident of Box Elder, South Dakota.  On or about May 30, 2019, he purchased a new 2018 Ford Roush F-150 pickup paying approximately $82,000. Mr. Raney compared the alleged fuel efficiency of the Ford F-150 with other similar trucks and selected the Ford F-150 truck based, in part, on Ford's representations about the vehicle's fuel efficiency.  Mr. Raney purchased his Ford F-150 with VIN 1FTEW1E51JFD88045, from McKie Ford, an authorized Ford dealership located in Rapid City, South Dakota. Mr. Raney purchased and still owns this vehicle.

Unbeknownst to Mr. Raney at the time the vehicle was purchased, it consumes more fuel than advertised.  Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Mr. Raney to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.  Ford knew about, or recklessly disregarded, the inaccurate fuel economy representations and the mileage cheat device included in the vehicle, but did not disclose such facts or their effects to Mr. Raney, so he purchased his vehicle on the reasonable but mistaken belief that his vehicle had better fuel economy than the competition, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life.  Mr. Raney selected and ultimately purchased his vehicle, in part, because of the stated fuel economy, as represented through advertisements and representations made by Ford.  Mr. Raney recalls that before he purchased the Ford F-150, he saw representations about the vehicle's performance, including its fuel economy, on Ford's website and on the vehicle's window sticker.  Had Ford disclosed the true fuel economy and dubious certifications of the vehicle, Mr. Raney would not have purchased the vehicle or would have paid less for it.  Mr. Raney and each Class member has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations, including, but not limited to, a high premium for exaggerated fuel economy, and

out-of-pocket losses by overpaying for the vehicles at the time of purchase and added fuel costs. Neither Ford nor any of its agents, dealers, or other representatives informed Mr. Raney or Class members of the true fuel economy of the Coastdown Cheating Vehicles prior to purchase.

### 8.  Stephen Leszczynski – Wisconsin

44.     Plaintiff Stephen Leszczynski is a Wisconsin citizen and resident of Mount Pleasant, Wisconsin.  On or about July 24, 2019, he purchased a new 2019 Ford Ranger pickup paying approximately $40,715.  Mr. Leszczynski compared the alleged fuel efficiency of the 2019 Ford Ranger with other similar trucks and selected the 2019 Ford Ranger truck based, in part, on Ford's representations about the vehicle's fuel efficiency.  Mr. Leszczynski purchased the 2019 Ford Ranger, with VIN 1FTER4FH7KLA33465, from Hieser Ford, an authorized Ford dealership located in Glendale, Wisconsin.  Mr. Leszczynski purchased and still owns this vehicle.  Unbeknownst to Mr. Leszczynski at the time the vehicle was purchased, it consumes more fuel than advertised.  Ford's unfair, unlawful, and deceptive conduct in designing, testing, manufacturing, marketing, and selling the vehicle with exaggerated fuel economy caused Mr. Leszczynski to suffer out-of-pocket loss in the form of overpayment at the time of purchase, in addition to added fuel costs.  Ford knew about, or recklessly disregarded, the inaccurate fuel economy representations and the mileage cheat device included in the vehicle, but

did not disclose such facts or their effects to Mr. Leszczynski, so he purchased his

vehicle on the reasonable but mistaken belief that his vehicle had better fuel

economy than the competition, was properly EPA-certified, and would retain all of

its promised fuel economy and performance throughout its useful life.  Mr.

Leszczynski selected and ultimately purchased his vehicle, in part, because of the

stated fuel economy, as represented through advertisements and representations

made by Ford.  Mr. Leszczynski recalls that before he purchased the 2019 Ford

Ranger, he saw representations about the vehicle's performance, including its fuel

economy, on Ford's website and on the vehicle's window sticker.  Had Ford

disclosed the true fuel economy and dubious certifications of the vehicle, Mr.

Leszczynski would not have purchased the vehicle or would have paid less for it.

Mr. Leszczynski and each Class member has suffered an ascertainable loss as a

result of Ford's omissions and/or misrepresentations, including, but not limited to,

a high premium for exaggerated fuel economy, and out-of-pocket losses by

overpaying for the vehicles at the time of purchase and added fuel costs. Neither

Ford nor any of its agents, dealers, or other representatives informed Mr.

Leszczynski or Class members of the true fuel economy of the Coastdown

Cheating Vehicles prior to purchase.

**B.      Defendant**

      **1.      Ford Motor Company**

      45.      Ford Motor Company is a corporation doing business in all 50 states

and the District of Columbia and is organized under the laws of the State of

Delaware, with its principal place of business in Dearborn, Michigan.

      46.      At all times relevant to this action, Ford manufactured, sold, and

warranted the Coastdown Cheating Vehicles throughout the United States. Ford

and/or its agents, divisions, or subsidiaries designed, and manufactured the

Coastdown Cheating Vehicles.  Ford also developed and disseminated the owner's

manuals, supplements, and warranty booklets, advertisements, and other

promotional materials relating to the Coastdown Cheating Vehicles, and Ford

provided these to its authorized dealers for the express purpose of having these

dealers pass such materials to potential purchasers at the point of sale. Ford also

created, designed, and disseminated information about the quality of the

Coastdown Cheating Vehicles to various agents of various publications for the

express purpose of having that information reach potential consumers.

## V.      FACTUAL ALLEGATIONS

**A.      Coastdown testing**

      47.      Ford deliberately miscalculated and misrepresented factors used in

vehicle certification testing in order to report that its vehicles used less fuel and

emitted less pollution than they actually did.  The certification test-related cheating

centers on the "Coastdown" testing and "Road Load" calculations.

48.    A coastdown test is a procedure that determines metrics later used to

calculate a vehicle's fuel economy values or "MPG rating." MPG ratings are

established using a machine called a "dynamometer." A dynamometer is like a

treadmill for vehicles, enabling vehicles to be operated indoors on a stationary

platform to simulate real-world vehicle operation. The level of resistance on the

dynamometer is adjusted based on coastdown testing for each specific vehicle

model to simulate the level of resistance that the vehicle would encounter if

operated on the road. Coastdown testing is used to determine the appropriate

resistance levels (or "road loads") to use on the dynamometer for a given vehicle

model. Coastdown testing is used to measure all types of resistance encountered by

a given vehicle model during real-world operation, including:

- Vehicle aerodynamic resistance, a factor affected by the vehicle's shape, which determines how much energy the vehicle uses to push air out of the way as it moves. The more resistance, the more energy has to be expended.

- Tire rolling resistance, a factor related to tire design that determines how much energy the vehicle has to use to overcome the resistance caused by the interface between the tires and the road.

- Driveline and powertrain mechanical resistance, a factor measuring the vehicle's drivetrain and how much energy the vehicle has to use to overcome internal friction to drive the wheels.

49.     A vehicle that has been properly broken in prior to the test (generally including vehicle and tire mileage, fluids and fuel, and vehicle warm-up) is driven up to a certain speed, typically around 80 MPH, after which it is put into neutral and allowed to coast until its speed drops below 9 MPH.

50.     Special devices in the vehicle accurately measure environmental conditions (ambient temperature, humidity and barometric pressure), performance data, and speed and distance traveled during the coastdown test.

51.     In order to eliminate the effect of wind speed and direction, the test is performed multiple times (a minimum of 5 runs) on a completely flat, straight, and dry road in both directions of the track. Analysis of the recorded speed and distance information provides the vehicle's road load force.

52.     Ford miscalculated "Road Load," which is a measure of those forces, defined as the force that is imparted on a vehicle while driving at a constant speed over a smooth, level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.[9]

53.     This measure of forces acting against the vehicle during real-world driving is critical to the simulation of actual driving when a vehicle is tested in the laboratory.  Ford's internal lab tests did not account for these forces, which lead to

---

[9] *See* Exhibit 1, https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1.

better—and entirely inaccurate—fuel economy projections, and claims that the

vehicles emitted less pollution than they emitted in reality.

**B.    The coastdown results are used to create fuel economy information posted on vehicles' windows and used in advertising.**

54.    The Coastdown test results are sent by Ford to the EPA to be used as

the basis for mileage information used on window stickers also called a

"Monroney sticker."

55.    The Monroney sticker is on the window of every new car and includes

information about the vehicle's price, engine and transmission specifications, other

mechanical and performance specs, fuel economy and emissions ratings, safety

ratings, and standard and optional features.

56.    The Monroney sticker is named for A.S. "Mike" Monroney, a

longtime Oklahoma congressman who wrote the 1958 Automobile Information

Disclosure Act, the federal law that requires the Monroney sticker.

57.    The Monroney sticker lists all features that come standard to the

vehicle. This might include air bags, anti-lock brakes, a radio and CD or MP3

player, plus any warranties or additional services such as roadside assistance. Also

included on the sticker is a section called "the EPA sticker." The Environmental

Protection Agency section of the sticker tells how many miles per gallon of gas the

vehicle gets on the highway and in the city. The EPA label provides miles-per-

gallon equivalent (MPGe) figures for electric and hybrid cars to help consumers

compare the fuel economy of these vehicles with gas- and diesel-powered cars. The EPA section will detail the vehicle's potential environmental impact with greenhouse gas emissions.

58.    The fuel economy figures are used by car reviewers and used by consumers to rate cars. For example, trucks are ranked on fuel economy as follows with the Ford F-150 at the top:

**9 Best Ranked MPG Trucks of 2018: Ranked:**

- 2016 Ford F-150 Automatic 2.7L
- 2016 Chevrolet Colorado Automatic 3.6L
- 2015 Chevrolet Silverado 1500 Automatic 4.3L
- 2015 Ford F-150 Automatic 3.5L
- 2014 Chevrolet Silverado 1500 Automatic 4.3L
- 2016 Chevrolet Silverado 1500 Automatic 4.3L
- 2016 Dodge Ram 1500 Automatic 3.6L
- 2016 Ford F-150 Automatic 3.5L[10]

59.    On the popular CarMax site[11], based on fuel economy numbers provided by Ford and published by EPA, CarMax had this to say about putting Ford F-150s near the top:

---

[10] Exhibit 15, Google and related search for F-150 fuel economy.

[11] Exhibit 16, https://www.carmax.com/articles/best-mpg-trucks-ranking (last visited Jul. 18, 2019).

# 8 Best Ranked MPG Trucks of 2019: Ranked

**PUBLISHED THURSDAY, JUNE 27, 2019**

## Achieve power and impressive fuel-economy.



Today, more and more manufacturers are producing trucks that get great fuel economy while still delivering impressive horsepower. If you're fuel-conscious and looking for the right truck, we've put together a power-packed list of trucks to help you on your search.

1. 2017 Chevrolet Colorado 2WD Automatic 2.5L




2017 Chevrolet Colorado LT  ©EVOX Images

2. 2018 Ford F-150 2WD Automatic 3.3L

 

3. 2015 Ford F-150 2WD Automatic 2.7L

 

4. 2016 Ford F-150 2WD Automatic 2.7L

 

5. [2017 Nissan Frontier 2WD Automatic 2.5L](#)




6. [2015-2016 Ford F-150 4WD Automatic 2.7L](#) & [2017 Toyota Tacoma 4WD Automatic](#)




7. [2015 Ford F-150 4WD Automatic 3.5L](#)




8. [2015 Chevrolet Silverado 1500 4WD Automatic 4.3L](#)



**C.   Ford admits improper coastdown testing.**

**1.   2019 Ranger**

60.   Ford has admitted that in September of 2018 several of its own employees were questioning its computer modeling and physical test practices for certification of fuel economy and emissions.[12]  Yet, Ford took no action to correct these ongoing misrepresentations or to alert consumers.

61.   Pressured by the pending governmental criminal investigation, Ford has now stated that it will look into the testing of the 2019 Ranger truck before looking at its other vehicles.  When Ford released a statement regarding the problem, truck blogger Andre Smirnov of TheFastLaneTruck.com drove the new Ranger for 1,000 miles, from California to Colorado to test its real-world mileage,

---

[12] Exhibit 2, [https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline](https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline).

and found it achieved only 19.5 MPG, not the 24 MPG certified to the EPA for the 4x4 model.[13]

62.    Having concluded that the actual performance of the Ranger was "nowhere close" to the EPA rated MPG, in March of 2019, the truck blogger tested the Ranger truck on The Fast Lane Truck's 98-mile fuel economy loop.[14]   "[T]he Ranger's trip computer told us that the truck managed just over 25 mpg, though our math at the fuel pump did not add up to the same number."[15]   The highway mileage was only one (1) MPG greater on the test loop than on its 1,000 mile drive.   The TFL test drivers were at a loss for words when they discovered a nearly four (4) MPG discrepancy between the mileage reported on the Ranger's trip meter and what they measured at the pump (21.3 MPG actual versus 25.8 MPG on Ford's trip meter)[16]:

---

[13] Exhibit 5, https://www.tfltruck.com/2019/02/real-world-2019-ford-ranger-fuel-economy-here-is-the-unexpected-result-after-a-1000-mile-road-trip-video/.

[14] Exhibit 14, https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.

[15] *Id.*

[16] Exhibit 6, Video of the testing located at https://youtu.be/W6iLtygCC7Y, embedded in the previously cited article at: https://www.tfltruck.com/2019/03/epa-says-the-new-ford-ranger-gets-24-mpg-on-the-highway-but-what-does-it-really-get-at-70-mph-video/.



EPA Says the New Ford Ranger Gets 24 MPG on the Highway, But What Does It Really Get at 70 MPH?

63.    Thus, Ford has programmed its onboard computers with a mileage cheat device to continue to lie about the vehicle's fuel economy in order to continually conceal the misrepresentation.

64.    With respect to its 2019 Ford Ranger, Ford promised that its midsize truck "will deliver with durability, capability and fuel efficiency, while also providing in-city maneuverability and the freedom desired by many midsize pickup truck buyers to go off the grid."[17]   Ford also claimed that its "All-New Ford Ranger [was] Rated Most Fuel Efficient Gas-Powered Midsize Pickup in

---

[17] Exhibit 3, Statement from Todd Eckert, Ford Truck Group's Marketing Manager, https://thenewswheel.com/2019-ford-ranger-most-fuel-efficient/.

America."[18]  "With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg

highway and 23 mph combined, 2019 Ford Ranger is the most fuel efficient gas-

powered midsize pickup in America."[19]  Ford claimed the 2019 Ranger "is the no-

compromise choice for power, technology, capability, and efficiency whether the

path is on road or off."[20]  Ford knew that to sell the Ranger, it had to tout it as

having fuel efficiency and reduced emissions, and that such promises were

material to consumers.

65.    There is no question that Ford used the fuel efficiency ratings as a

sales tool to entice consumers into purchasing the 2019 Ford Ranger.  Indeed, Ford

promised that "[t]he adventure-ready 2019 Ford Ranger is the most fuel-efficient

gas-powered midsize pickup in America—providing a superior EPA-estimated city

fuel economy rating and an unsurpassed EPA-estimated combined fuel economy

rating versus the competition.  The all-new Ranger has earned EPA-estimated fuel

economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined for 4x2

trucks."[21]  Ford claimed that "[t]his is the best-in-class EPA-estimated city fuel

---

[18] Exhibit 4,
https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

[19] *Id*.

[20] *Id*.

[21] *Id.*

economy rating of any gasoline-powered four-wheel-drive midsize pickup and it is an unsurpassed EPA-estimated combined fuel economy rating."[22]

66.    By cheating in the certification testing, and providing a mileage cheat device in the vehicles, Ford made its F-150 trucks more appealing and competitive in the marketplace, to the point of being named "best in class" for some 150's and driving up sales and profits.

## D.    CAFE standards provide manufacturers with credits for low emissions.

67.    Ford also reaped a double reward from this cheating.  Cars and trucks are one of the major sources of air pollution, which includes ozone, particulate matter, and other smog-forming emissions. The health risks of air pollution are extremely significant—poor air quality increases respiratory ailments like asthma and bronchitis, heightens the risk of life-threatening conditions like cancer, and burdens the American health care system with substantial medical costs. Passenger cars and trucks are major contributors to pollution, producing significant amounts of nitrogen oxides, carbon monoxide, and other pollution. The U.S. government, through the EPA, has passed and enforced laws designed to protect U.S. citizens from these pollutants and certain chemicals and agents known to cause disease in humans.

---

[22] *Id.*

68.     The United States has two sets of parallel standards that affect fuel economy: (1) the corporate average fuel economy (CAFE) standards adopted by the National Highway Traffic Safety Administration (NHTSA), an agency within the Department of Transportation (DOT); and (2) greenhouse gas (GHG) emissions standards adopted by the EPA.

69.     Automobile manufacturers must abide by these laws and must adhere to EPA rules and regulations.  One of the major drivers of fuel efficiency improvement are the CAFE standards.  These requirements have nearly doubled the fuel efficiency of vehicles in the U.S.  In addition to the reduced health costs and human illness, CAFE standards are estimated to save each U.S. household approximately $2,000.00 per year in reduced fuel consumption as of 2016.  The Energy Independence and Security Act (EISA) of 2007 mandated a 40% increase in fuel economy by 2020.

70.     The original CAFE standards set minimum average fuel consumption performance (average miles travelled per gallon of fuel used) for the fleets of new "passenger automobiles" (passenger cars) and "non-passenger automobiles" (light trucks, which includes many SUVs) produced by each manufacturer. The standards for these two types of vehicles differed.

71.     Before standards took effect, the average fuel efficiency for passenger cars was 15.2 MPG). Congress required manufacturers to achieve a fleet average

of 18 MPG by 1978, 19 MPG by 1979, and 20 MPG by 1980, rising to 27.5 MPG by 1985, with interim standards to be set by NHTSA. But by 1981 average fuel efficiency for passenger cars had risen to 28.4 MPG, exceeding the standards.

72.    For light trucks, NHTSA set standards that required manufacturers to achieve a fleet average of 17.2 MPG for two-wheel drive vehicles and 15.8 MPG for four-wheel drive vehicles in 1979, rising to 21.5 MPG and 19 MPG respectively by 1989. Over this period, two-wheel drive vehicles increased from 13.4 to 16.9 MPG while four-wheel drive vehicles increased from 12.3 MPG to 14.4 MPG.

73.    The National Highway Traffic Safety Administration (NHTSA) kept CAFE standards for cars the same from 1985 to 2010, except for a slight decrease in required MPG from 1986 to 1989. Truck standards, initially set in 1976 for 1989 vehicles at 21.5 MPG for 2-wheel drive vehicles and 19 MPG for 4-wheel drive vehicles, were frozen by Congress in the mid-1990s at 20.7 MPG and were not increased until 2005.

74.    However, starting in 2005, Washington policy makers ushered in a number of changes. Between 2005 and 2007, the Bush administration raised the truck fuel efficiency standard from 20.7 to 22.2 MPG. More significantly, in 2007, Congress passed the Energy Independence and Security Act (EISA), which requires model-year 2011 and later vehicles for sale in the U.S. that were

manufactured outside the U.S. to achieve a fleetwide gas mileage of 35 MPG and requires vehicles for sale in the U.S. that were manufactured in the U.S. to achieve a fleetwide gas mileage of 27.5 MPG by 2020. In 2009, the Obama administration eliminated the default 27.5 MPG standard and established a new 27.3 MPG standard for 2011 model-year vehicles manufactured domestically and internationally. The new standard was scheduled to increase annually until it reached 35 MPG for 2020 model-year vehicles.

75.    Starting in 2005 for trucks and 2011 for all vehicles, the standard is based on one specific attribute: a manufacturer's collective vehicle footprint. The formula multiplies every vehicle's wheelbase by its average track width for each manufacturer. This creates a relatively simple inverse-linear formula with cutoff values. The attribute-based formula produces one number for each automaker. So while each model sold does not have to achieve a specific target, the automaker's fleet on a whole must meet its target. This method helps balance earlier standards, which were biased against automakers whose overall vehicle lineup was fuel-efficient, but sold one or two models (typically work trucks) that were not fuel-efficient.

76.    For example, the GM Sierra Denali is a full-size work truck with an MPG range of 16 in the city and 23 on the highway. The Honda Ridgeline is a mid-size truck with an MPG range of 19 in the city and 26 on the highway. To

balance the lower fuel efficiency of the Denali, GM also builds the hybrid Chevrolet Volt that gets 42 MPG. If the absolute standard was 20 miles per gallon, drivers would not be able to buy the Denali work truck, which averages 19. But because the standard is by manufacturer and not model, GM can use the Volt to help balance the Denali.

77.     In 2012, NHTSA and the EPA issued joint standards for 2017–2025. While NHTSA's standards continued to focus on fuel efficiency, the EPA's more-stringent regulations targeted reductions in carbon dioxide emissions (greenhouse gas emissions) and not fuel efficiency. NHTSA increased the CAFE standards to 41 MPG by 2021 and 49.7 MPG by 2025. The EPA's standard of 163 g/mi of $CO_2$-equivalent emissions effectively increased standards to 54.5 MPG by 2025. This 54.5 MPG 2025 standard is the first one benchmarked to emissions and not gasoline consumption.

78.     Both the NHTSA and EPA standards offer certain flexibilities, termed "components," to help manufacturers comply with the standards. The first component is a credit trading system that allows manufacturers to carry efficiency and greenhouse gas credits forward by up to five years and backwards by up to three years to achieve compliance and avoid fines. Manufacturers can transfer credit between cars and trucks and trade credits with other manufacturers. Carbon

dioxide credits generated for EPA compliance from model year 2016 and before can be carried forward up to model year 2021.

79.     In 2016 NHTSA announced plans to more than double the fines for failing to meet CAFE standards from $5.50 per 0.1 MPG to $14.00. The fine is applied to each 0.1 MPG the automaker falls short and multiplied by the number of vehicles sold in a model year. Companies must satisfy both EPA and NHTSA standards. Manufacturers passing EPA's greenhouse gas emissions standards that fail NHTSA's CAFE standards still pay the fine.

80.     Manufacturers have a clear economic motivation to meet the standards. If an automaker fails to meet the standards for the model year, it must pay a penalty of $5.50 per 0.1 miles per gallon below the standard, multiplied by the total number of vehicles the manufacturer has produced for the entire U.S. domestic market.

81.     Under the increasing federal standards, Ford also began to market its gasoline powered vehicles as being cleaner, with high fuel economy.  As the Ford Ranger was out of the market for eight years, Ford took a targeted marketing approach for the 2019 Ranger, focusing on "outdoorsy digital ads," that pitched the truck to outdoor adventurists.[23] Ford capitalized on its fuel efficiency as a selling

---

[23] Exhibit 8, https://adage.com/article/cmo-strategy/ford-takes-targeted-approach-ranger-comeback/316801.

point over its competitors.[24]  Ford sought a strong re-entry of the Ranger into the

U.S. market by pitching it as amazingly fuel efficiency.

## E.    Criminal investigation

82.    Ford Motor Company's March 2019 Securities and Exchange

Commission filing revealed that it is under criminal investigation by the United

States Department of Justice for its emissions certification practices.[25]

83.    Ford Motor Company is a leading auto manufacturer, having sold 2.5

million vehicles in 2018.  Ford's strategy has increasingly focused on the

manufacture and sale of larger gas-guzzling pickup trucks, sport utility vehicles

(SUVs), and vans.  These vehicles are, of course, the most challenged by emissions

standards and fuel efficiency.  Ford's focus on this segment of the market created

an immense incentive to cheat.

84.    In September of 2018, several Ford employees expressed concerns

about the testing practices at Ford pertaining to emissions and fuel efficiency.  In

February of 2019, Ford admitted it was looking into these concerns about its

"computer-modeling methods and calculations used to measure fuel economy and

---

[24] Exhibit 9, https://www.caranddriver.com/news/a25470574/2019-ford-ranger-pickup-mpg/.
[25] Exhibit 10, Ford's March 31, 2019 Quarterly Report to the SEC, at page 70: https://www.sec.gov/Archives/edgar/data/37996/000003799619000026/f03312019 10-q.htm.

emissions."[26]   Kim Pittel, Ford's vice president for sustainability, environment and safety engineering, has admitted to the New York Times that these "calculations [are] used in testing cars for fuel economy ratings and emissions certifications."[27]

## F.   Mechanism of coastdown cheating

85.   The Environmental Protection Agency (EPA) defines "Road load" as follows:

> the force imparted on a vehicle while driving at a constant speed over a smooth level surface from sources such as tire rolling resistance, driveline losses, and aerodynamic drag.

EPA letter to manufacturers, titled: "*Determination and Use of Vehicle Road-Load Force and Dynamometer Settings.*"[28]   These calculations are critical to laboratory fuel efficiency and emissions testing because the vehicle is placed on a dynamometer, which is essentially a treadmill for cars.   When driving on a dynamometer, the vehicle is stationary and does not experience the drag of air against the vehicle; or of the resistance of the tire against the road surface; or the loss of horsepower that occurs in the drivetrain of the vehicle, the friction, heat, drag, and other various losses that occur between the engine and tires touching the road.

---

[26] Exhibit 11, https://www.nytimes.com/2019/04/26/business/ford-emissions-criminal-investigation.html.

[27] Exhibit 2, https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline.

[28] Exhibit 1, https://iaspub.epa.gov/otaqpub/display_file.jsp?docid=34102&flag=1.


2017 Ford F-350 During Dynamometer Testing

86.     Auto manufacturers use "coastdown" tests of vehicles on the actual roadway to help calculate variables to be utilized in conjunction with dynamometer testing.  Coastdown testing provides data regarding aerodynamic drag, tire rolling resistance, and drivetrain frictional losses and provides technical data used to program the test dynamometers that generate EPA fuel economy and emissions ratings.  In a coastdown test, a vehicle is brought to a high speed on a flat, straight road and then set coasting in neutral until it slows to a low speed.  By recording the time the vehicle takes to slow down, it is possible to model the forces affecting the vehicle.  Coastdown tests are governed by tests developed by the Society of Automotive of Engineers (SAE).  SAE developed a standard procedure (J2263-Dec 2008) to perform road load measurement using coastdown testing, and a standard procedure (J1263-Mar 2010) to perform road load measurement and dynamometer

simulation using coastdown testing. The current government-approved standard for road load measurement using onboard anemometry and coastdown testing technique is the SAE International Standard.  These standards must be followed by federal regulation.  The data relating to speed and distance are recorded by special instruments to account for various factors that might affect the results.  The test produces data that identifies or maps the drag and other forces acting on the vehicle in the real world.

87.    A coastdown requires planning, data collection, and data processing, but offers many opportunities for manipulation of the data.  Data variability and error can be controlled, but several factors must be considered under SAE standards, including calculation of the mass of the vehicle, tire pressure, weather, and environmental factors (e.g., wind speed, air temperature, humidity, and barometric pressure), aerodynamic factors, and road surface, as well as experiment design and methodology, measurement errors, data acquisition systems, and vehicle qualifications.  The SAE procedure on coastdown testing includes an appendix with FORTRAN code that processes experimental velocity data and produces a mathematical vehicle force model.

88.    The protocol specifies all conditions under which the engine is tested, including lab temperature and vehicle conditions. Most importantly, the test cycle defines the vehicle speed over time that is used to simulate a typical driving

scenario. An example of a driving cycle is shown in Figure A. This graph

represents the FTP-75 (Federal Test Procedure) cycle that has been created by the

EPA and is used for emission certification and fuel economy testing of passenger

vehicles in the United States. The cycle simulates an urban route with frequent

stops. The cycle lasts 1,877 seconds (about 31 minutes) and covers a distance of

11.04 miles (17.77 km) at an average speed of 21.2 mph (34.12 km/h).

Figure A



89.    To assess conformance, these tests are carried out on a chassis

dynamometer, a fixture that holds a car in place while allowing its driven wheels to

turn (a treadmill for cars) with varying resistance meant to simulate the actual load

on the engine during on-road driving.  Fuel consumption and emissions are

measured during the test and compared to an emissions standard that defines the

maximum pollutant levels that can be released during such a test. In the United

States, emissions standards are managed on a national level by the EPA. In addition, California has its own emissions standards that are defined and enforced by CARB. California standards are also adopted by a number of other states ("Section 177" states).[29] Together with California, these states cover a significant fraction of the U.S. market, making them a de facto second national standard.

## G.   F-150 test results

90.   Plaintiffs tested a 2019 Ranger.  Before rounding for the Monroney sticker the highway fuel economy is 23.4 mpg, compared to 25 reported to the EPA.  or the city it is 18.3 mpg, compared to 20.0 reported to the EPA.

91.   If converted to Monroney values:

| **EPA Reported:** | **Measured:** |
| --- | --- |
| City:  20 | City:  18 |
| Highway:  25 | Highway:  23 |
| Combined:  22 | Combined:  21 |

92.   So this is a difference of 10% in city driving, and 8% on the highway. Assuming 150,000 miles in a vehicle's life, this results in an additional 833 gallons for city driving or increased fuel costs of 42,324.  For highway driving there will be an additional 521 gallons consumed at a cost of $1,453.

---

[29] Those states are: Connecticut, Maine, Maryland, Massachusetts, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, Delaware, Georgia, and North Carolina.

93.     Testing was conducted on a 2018 Ford F-150 SuperCrew 4x2 truck and a 2019 Ford Ranger SuperCrew 4x2 truck to independently verify the model inputs used to calculate fuel economy of those vehicles.

94.     Fuel economy testing to provide the values listed on the Monroney label of passenger cars and light duty trucks for sale in the United States is performed on a chassis dynamometer, a kind of stationary treadmill that simulates the forces acting on the vehicle during real world driving. Dynamometer testing is required by the United State Environmental Protection Agency (US EPA) for emissions certification and fuel economy testing, both for labeling purposes and for compliance with Corporate Average Fuel Economy, or CAFE, standards. Real world models specific to every vehicle tested, called "road load models," are used during testing to ensure the dynamometer accurately simulates the real world frictional losses a vehicle experiences during operation on the road. These models are specific to every vehicle tested for fuel economy. For vehicles having a variety of body configurations, like the F-150 and Ranger, each configuration and weight class (grouped according to "equivalent test weight" by the EPA) will have its own unique model. The road load model is obtained by performing a vehicle "coastdown," a process whereby the time to decelerate a vehicle from a high speed is measured. The standardized technique for performing a coastdown is prescribed

in the Code of Federal Regulations, which references the use of Society or

Automotive Engineering (SAE) Standard J2263.

95.     In the case of both the 2018 F-150 tested and the 2019 Ranger, the

road load obtained in the J2263 coastdown for each vehicle was found to have

more resistance (which would result in more fuel consumption) than the road load

models reported to the EPA.

96.     In order to accurately measure fuel efficiency, the dynamometer

rollers must simulate the parasitic frictional forces a vehicle would experience if it

were to be driving on the road. The quadratic function below replicates these

forces (a combination of driveline parasitic losses, rolling resistance, and

aerodynamic drag). The coastdown test yields the coefficients (A, B, and C below)

that are used to model a particular vehicle's road load. In certification documents

and the EPA fuel economy test database, these are often referred to as the "target

coefficients:" $Force(V) = A + B \cdot V + C \cdot V^2$, where V is the speed of the

vehicle.

97.     Once a vehicle's target coefficients are obtained, the vehicle is

calibrated, or "matched," to the dynamometer to determine the force the

dynamometer must apply to simulate the target road load. The "match" accounts

for the friction and inertia inherent in the dynamometer's driveline and rolls. This

process produces a data set called the "Set Coefficients," values specific to a

particulate vehicle and a particular dynamometer calibration. Once the set coefficients are obtained, the dynamometer can accurately replicate the weight (or inertia) of the vehicle as well as the road load forces. The processes required by the Code of Federal Regulations, as well as SAE J2264, were strictly followed to match the vehicle to the dynamometer and to perform fuel economy testing.

98.     The 2018 Ford F-150 SuperCrew and 2019 Ford Ranger SuperCrew used for testing were selected to replicate vehicles presented in the US EPA fuel economy test database.[30] The EPA database provides vehicle and test data details including, cab length, drivetrain (4 wheel drive vs 2 wheel drive), axle ratio, engine, and transmission. Furthermore, the database provides the road load model, and the FTP-75, and HWFET results presented to the US EPA to certify the fuel economy. SAE J2263 and EPA Guidance Letter *CD-15-04* provided selection criteria for tire size and trim options based on vehicle population statistics. The test-truck configurations are shown in Table 1.

### Table 1 - Test Vehicles

| MY/Make | Model | Cab Style | Drivetrain | Axle Ratio | Engine | Transmission | Equivalent Test Weight (lbs) |
|---|---|---|---|---|---|---|---|
| 2018 Ford | F-150 | SuperCrew (4 door) | 4x2 | 3.55 | 2.7L V6 Ecoboost | 10 Speed Auto | 5,000 |
| 2019 Ford | Ranger | SuperCrew (4 door) | 4x2 | 3.73 | 2.3L I4 Ecoboost | 10 Speed Auto | 4,750 |

---

[30] https://www.epa.gov/compliance-and-fuel-economy-data/data-cars-used-testing-fuel-economy.

99.    In preparation for coastdown testing the trucks and tires were aged to just over 4,000 miles as directed by SAE J2263. The trucks were fitted with an anemometer on a preceding boom, GPS antennae, and an eDAQ XR Lite data acquisition system. The body was checked for any damage that might affect aerodynamic drag. Tire tread depths and pressures were measured. The brakes were checked for contact and the alignment was checked and adjusted as necessary. The F-150 was loaded with sandbags to a scale weight of 4,990 lbs. and the Ranger to 4,750 lbs. The trucks were warmed to operating temperature, as per SAE J2263, by driving for more than 30 min at 50 mph. Once warmed, the tire pressures were re-adjusted and the truck immediately tested.

100.    The coastdown test-driver accelerated the test truck to approximately 80 mph, placed the transmission into neutral, and coasted the truck until deceleration reduced the speed below 9 mph. This process was repeated for each truck 12 times: 6 in each direction. Truck speed, time, apparent wind velocity, track temperature, ambient temperature, and pressure were measured and recorded for each run.  This date was used to generate the force target coefficients listed in Table 2 and compared to the EPA Fuel Economy Database target coefficients.

**Table 2 - Target Coefficients (A,B, and C) from Coastdown Tests with Comparison to Values from EPA Database**

| Target Coefficients | Ford F-150 | | Ford Ranger | |
|---|---|---|---|---|
| | From Test | From EPA Database | From Test | From EPA Database |
| A (lbf) | 25.1113 | 26.570 | 23.7939 | 31.540 |
| B (lbf/mph) | 0.9725 | 0.05130 | 0.8954 | 0.29320 |
| C (lbf/mph^2) | 0.0273 | 0.03385 | 0.0288 | 0.03433 |

101.   The quadratic coefficients above are used to tune the dynamometer during the dynamometer match. The effects of these different road load coefficients can be seen in Figure **1**.



**Figure 1 – MY 2018 Ford F-150 Road Load Force**

102.   The coefficients Ford supplied to the EPA underestimate the force acting on the truck. This underestimation of force yields the over estimation of fuel economy. In the speed ranges where the road load has the greatest effect on overall

engine load, road load forces are some 20-35% higher than those values reported to EPA.

103.  The Ranger measured road load model produces is some 5-8% higher in those same speed ranges, see Figure 2.



**Figure 2 – MY 2019 Ford Ranger Road Load Drag Force**

104.  Fuel economy was quantified on both the FTP-75 and HWFET cycles in strict accordance with the federal regulations by accounting for both the fuel properties and the carbon-containing emissions from the test cycles. Testing was performed using Tier 2 gasoline, again as prescribed by regulations and as presented in the EPA fuel economy database. The fuel economy values calculated from FTP-75 and HWFET results were used to calculate label fuel economy using

the derived 5-cycle method specified in 40 CFR § 600.115-11[31] and shown in the

equations below;

$$City\ FE = \cfrac{1}{City\ Intercept + \cfrac{CitySlope}{FPT\ FE}}$$

And for highway fuel efficiency;

$$Highway\ FE = \cfrac{1}{Highway\ Intercept + \cfrac{Highway\ Slope}{HWFET\ FE}}$$

105.   The respective slopes and intercepts are created from a regression of

fuel economies across multiple vehicles.   These values are periodically published

by the EPA Administrator. The coefficients for the model years corresponding to

the trucks tested are shown in Table 3.

**Table 3 Current Derived 5-cycle Coefficients.  Source CD-15-15**

|  | Coefficients of Model Year 2017 and Later |
|---|---|
| City Intercept | 0.004091 |
| City Slope | 1.1601 |
| Highway Intercept | 0.003191 |
| Highway Slope | 1.2945 |

---

[31] Current fuel economy regulations require that every manufacturer test their vehicle fuel economy using the same 5 test cycles used for emissions testing (FTP-75, HWFET, US06, SC03, and Cold CO). A complex calculation is used based on the results of each of those tests to determine the "City" and "Highway" fuel economy to be used on the Monroney label. If the emissions test vehicle used for emissions certification passes a "litmus test," the EPA allows a "derived 5 cycle" fuel economy calculation that is based on the results of two tests only: the FTP-75 and HWFET. The purpose of this litmus test is to reduce the number of total tests manufacturers must perform to test for fuel economy. Because the 2019 Ford Ranger and 2018 Ford F-150 both pass the litmus test in their certification applications, the "derived 5 cycle" calculation is used.

106.   The calculated fuel economies obtained from testing are compared to the fuel economies presented to the EPA in the application for certification and each vehicle's Monroney label in Table 4.

**Table 4 - Fuel Economy Comparison**

|  | Ford F-150 | | | Ford Ranger | | |
|---|---|---|---|---|---|---|
|  | FE Measured | FE EPA App | FE Monroney | FE Measured | FE EPA App | FE Monroney |
| City (mpg) | 17.7 | 19.6 | 20 | 18.3 | 20.0 | 20 |
| Highway (mpg) | 22.7 | 26.6 | 26 | 23.4 | 25.0 | 25 |
| Combined (mpg) | 20.0 | 22.8 | 22 | 20.6 | 22.3 | 22 |

107.   For the Ford F-150, if the measured fuel economy values are rounded to the nearest whole number, as prescribed for Monroney labeling calculations, the resulting city fuel economy label would be 18 mpg for city driving, 23 mph for highway driving, and 20 mph combined. Compared to the EPA label, this represents a difference in fuel economy of 2 mpg for the city (10%), 3 mpg highway (12%), and 2 mpg combined (9%). The certification application states a full useful life of 150,000 miles.   Over this lifetime mileage, there will be an additional 833 gallons consumed for city driving, 752 gallons for highway driving, and 682 gallons combined. Based on the current national average fuel price of $2.79, this would represent an added lifetime fuel cost of $2,324, $2,098, and $1,903 for city, highway, and combined, respectively.

108.   For the Ford Ranger, if the measured fuel economy values are rounded to the nearest whole number, as prescribed for Monroney labeling

calculations, the resulting city fuel economy label would be 18 mpg for city driving, 23 mph for highway driving, and 21 mph combined. Compared to the EPA label, this represents a loss in fuel economy of 2 mpg for the city (10%), 2 mpg highway (8%), and 1 mpg combined (5%). The certification application states a full useful life of 150,000 miles.   Over this lifetime mileage, there will be an additional 833 gallons for city driving, 522 gallons for highway driving, and 325 gallons combined. Based on the current national average fuel price of $2.79, this would represent an added lifetime fuel cost of $2,324, $1,456, and $907 for city, highway, and combined, respectively.

109.   The difference in fuel consumption and money spent over the 150,000 mile life of the vehicles is summarized in Table 5 below.

**Table 5 – Lifetime Additional Fuel Consumed and Money Spend on Fuel Based on Actual Testing Compared to EPA Reported Valued**

|  | Ford F-150 | | Ford Ranger | |
|---|---|---|---|---|
|  | Gallons | $ | Gallons | $ |
| City (mpg) | 833 | $2,324 | 833 | $2,324 |
| Highway (mpg) | 752 | $2,098 | 522 | $1,456 |
| Combined (mpg) | 682 | $1,903 | 325 | $907 |

## H.    Ford's History of Cheating

110.   Ford is the granddaddy of emissions cheaters.  The recent Volkswagen emissions cheating debacle is definitely not the first.  In 1973, Ford and Volkswagen were caught in the EPA's first investigation into emission cheating devices.

111.   Ford was caught again in 1998, using a cheat device in 60,000 Econoline vans, which resulted in a multi-million-dollar settlement with the EPA.[32]

112.   Ford was caught just last year, cheating on emissions certification for over 500,000 heavy-duty diesel trucks.  Ford was sued by the undersigned firm for this cheat method, and the litigation is ongoing.

113.   But Ford learned the wrong lesson from getting caught.  Ford may be shifting away from cheating the government with cheat devices, finding an easier target for its fraud.  Ford is increasingly misrepresenting the fuel efficiency of its vehicles, which is a more indirect way of cheating on emissions requirements. Through computer modeling, Ford constructs a fuel efficiency for each vehicle that does not exist in the real world.

114.   Ford over-stated the fuel efficiency of its Ford Fusion and C-MAX hybrid vehicles and was sued for it.  As a result, "[i]n 2013 and 2014, it lowered the gas mileage ratings on several hybrid cars by one to seven miles per gallon."[33]

---

[32] Exhibit 12, "*VW Emissions 'Defeat Device' Isn't the First*" 9/24/15 article in Autoweek: https://autoweek.com/article/car-news/vw-emissions-defeat-device-isnt-first.

[33] Exhibit 2, https://www.nytimes.com/2019/02/21/business/ford-emissions.html?module=inline.

## I.     Ford advertising for the Ranger emphasizes fuel economy.

115.   Even after Ford employees had come forward about the cheating,

Ford's media center touted the 2019 Ranger truck as having amazing performance

without compromise, and the claims of its fuel efficiency are front and center:



- With EPA-estimated fuel economy ratings of 21 mpg city, 26 mpg highway and 23 mpg combined, 2019 Ford Ranger is the most fuel-efficient gas-powered midsize pickup in America

December 11, 2018 Ford Media Press Release titled, "*Adventure Further: All-New*

*Ford Ranger Rated Most Fuel-Efficient Gas-Powered Midsize Pickup in*

*America.*"[34]

---

[34] Exhibit 4,
https://media.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html.

116.   Ford's claim of most fuel efficient in its class is repeated in sales

brochures for the 2019 Ranger[35]:



**J.     Ford promotes the F-150 as best in class for fuel economy or publishes MPG estimates to beat its competition.**

117.   The F-150 is the best-selling vehicle in the United States and has been

so for decades.  In 2018, Ford sold more than 1.075 million F-150s, a sale every

29.3 seconds.  As Ford executive Jim Farley noted, "But it's our F-Series

---

[35] Exhibit 19, 2019 Ford Ranger brochure.

juggernaut that leads the world in sales, capability and smart technology, setting the bar others follow."[36]

118.   To stimulate F-150 sales and maintain its lead over competitors like the Dodge Ram, Ford announced that the 2018 Ford F-150 would be best in class for fuel economy and/or published inflated MPG estimates.

119.   As early as August 2017, based on information from Ford, consumers were told to expect "better fuel economy" in the 2018 F-150.

120.   The Monroney sticker for a 2018 F-150 2.7 V6[37] lists the MPG as follows:

---

[36] Exhibit 17, https://media.ford.com/content/fordmedia/fna/us/en/news/2019/01/12/ford-surpasses-1-million-truck-sales-in-2018.html.

[37] Exhibit 18.



121.   An August 10, 2017 cnet.com article "*2018 Ford F-150 touts best-in-class towing, payload, fuel economy*" states:

> Buyers have a choice of *five* different engines. The base offering is a 290-horsepower 3.3-liter V6, followed by a 325-hp 2.7-liter turbo V6. In the middle of the range is the 5.0-liter V8 with 395 horsepower. The top two engine

choices are both 3.5-liter turbocharged V6s -- one putting out 375 horsepower, and the other putting out 450.[38]

122.   The cnet.com article emphasizes fuel economy:

With these new engines comes better fuel economy. And once again, Ford gets to claim best-in-class, thanks to the 2.7-liter V6, which achieves 20 mpg city and 26 mpg highway in 2WD. The 3.3-liter V6 isn't very far behind it at 19 mpg city and 25 mpg highway. The thirstiest engine of the bunch is the high-output 3.5-liter turbo V6, which still isn't too bad at 15 mpg city and 18 mpg highway.[39]

123.   The 2018 F-150 brochure[40] lists the estimated fuel economy for the various types of 150s:

---

[38] Exhibit 20, https://www.cnet.com/roadshow/news/2018-ford-f-150-touts-best-in-class-towing-payload-fuel-economy/ (last visited July 19, 2019) (emphasis in original).

[39] *Id.*

[40] Exhibit 21, 2018 Ford F-150 brochure.



## ALL-NEW
## 3.3L Ti-VCT V6

The all-new, standard F-150 powerplant for 2018 delivers where it matters most: higher towing capability, more payload capacity, and improved fuel efficiency.[2] That's a clean sweep in any truck buyer's ledger. Plus, a higher compression ratio and higher max. combustion peak pressure help surpass previous horsepower and torque numbers. A dual-injection system features both direct injection and port fuel injection to improve power output and efficiency over a wide variety of engine loads.

A 6-speed SelectShift automatic transmission is paired with the 3.3L Ti-VCT engine.

| | |
|---|---|
| Horsepower | 290 @ 6,500 rpm |
| Torque | 265 lb.-ft. @ 4,000 rpm |
| EPA-estimated ratings[5] | 19 city/25 hwy/22 combined mpg |
| Max. payload capacity[6] | 1,990 lbs. |
| Max. towing capacity[5] | 7,700 lbs. |



# ENHANCED
## 2.7L ECOBOOST®

t    Named one of "Our 10 Favorite Gas
Burners" by *Car and Driver*. And that
was before the upgrades increased
torque to 400 lb.-ft. 2nd-generation
updates to this twin turbo[3] include
a new dual-injection system that
features both direct injection and
port fuel injection. Two injectors per
cylinder – one mounted in the intake
port and another inside the cylinder –
improve power output and efficiency.

Strength and durability come from
compacted graphite iron (CGI)
that forms the upper engine block
and cylinders. New for 2018, the
2.7L[3] is paired with the 10-speed
SelectShift automatic transmission
for exceptional driveability.

| |
| --- |
| 325 @ 5,000 rpm |
| 400 lb.-ft. @ 2,750 rpm |
| 20 city/26 hwy/22 combined mpg |
| 2,470 lbs. |
| 9,100 lbs. |



## ENHANCED
## 5.0L Ti-VCT V8

Horsepower and torque – increased. Fuel efficiency – improved. The trusted 5.0L V8 engine[3] – better than ever. A new dual-injection system increases compression ratio to 12:1. Upgraded main and connecting rod bearings provide greater durability. And, new for 2018, the V8 is paired with the 10-speed SelectShift automatic transmission for the first time. "The 5.0L ... roars with a burly truck V8 note," says *Motor Trend*.

An available, class-exclusive CNG/ Propane Gaseous Engine Prep Package can ready your V8-equipped F-150 to be upfit for compressed natural gas (CNG), propane autogas, or as a bi-fuel vehicle with the ability to switch between CNG or propane and gasoline.[4]

| |
|---|
| 395 @ 5,750 rpm |
| 400 lb.-ft. @ 4,500 rpm |
| 17 city/23 hwy/19 combined mpg |
| 3,270 lbs. |
| 11,600 lbs. |



## 2ND-GEN
# 3.5L ECOBOOST

All-new for the 2017 model year, the 3.5L EcoBoost[3] soldiers on for 2018 with a class-best 470 lb.-ft. of torque, along with 375 horsepower. Paired with the 10-speed SelectShift automatic transmission, engine torque is readily available across the speed range for instant acceleration and exceptional low-end and peak performance. Exactly what's needed for hauling heavy loads and towing heavy trailers.

A roller-finger follower valvetrain features durable intake and exhaust valves, as well as hydraulic valve-lash adjusters that optimize engine durability.

| |
|---|
| 375 @ 5,000 rpm |
| 470 lb.-ft. @ 3,500 rpm |
| 18 city/25 hwy/21 combined mpg |
| 3,230 lbs. |
| 13,200 lbs. |



# ALL-NEW 3.0L POWER STROKE DIESEL

As the first-ever diesel engine in Ford F-150, the 3.0L Power Stroke® Turbo Diesel³ delivers 440 lb.-ft. of diesel torque and 250 diesel horsepower – both best in class. It's also paired with the 10-speed SelectShift automatic transmission to put all its usable low-end engine torque to good use.

With the transmission's 10-speed architecture, and the engine's peak torque arriving at a low 1,750 rpm, the diesel powertrain is an exceptional choice for towing – where strong torque delivery throughout the rpm range is exactly what you need.

| |
|---|
| 250 @ 3,250 rpm |
| 440 lb.-ft. @ 1,750 rpm |
| 22 city/30 hwy/25 combined mpg |
| 1,940 lbs. |
| 11,400 lbs. |

**K.      Economic harm**

124.   As a result of Defendant's unfair, deceptive, and/or fraudulent business practices, Plaintiffs did not receive the fuel efficiency that was advertised and will incur increased fuel costs over the life of their vehicle.  Had Ford told the truth, that it was cheating on its coastdown testing, plaintiffs would not have bought their vehicle or would have paid substantially less.

## VI.      TOLLING OF THE STATUTE OF LIMITATIONS

**A.      Discovery rule tolling**

125.   Class members had no way of knowing about Ford's deception with respect to the Coastdown Cheating Vehicles' performance in real-world driving. To be sure, Ford continues to market the Coastdown Cheating Vehicles, including the 2019 Ranger, with false representations of its fuel efficiency.  The Coastdown Cheating Vehicles also contain a computerized mileage "cheat device" that constantly misrepresents the fuel efficiency to consumers as they drive.

126.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Class could not have discovered through the exercise of reasonable diligence that Ford was concealing the conduct complained of herein and misrepresenting the company's true position with respect to the performance of the Coastdown Cheating Vehicles.

127.   Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did

not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had concealed information about the true emissions of the Coastdown Cheating Vehicles, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that Ford valued profits over truthful marketing and compliance with the law.

128.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Coastdown Cheating Vehicles.

**B.     Fraudulent concealment tolling**

129.   All applicable statutes of limitation have also been tolled by Ford's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

130.   Instead of disclosing its fuel economy and emissions testing scheme, Ford continues to falsely represent that the Coastdown Cheating Vehicles have higher fuel economy and lower emissions than advertised.

## C.    Estoppel

131.   Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Coastdown Cheating Vehicles' fuel efficiency and emissions.

132.   Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fuel efficiency and emissions in the Coastdown Cheating Vehicles and continues to do so in its advertising and brochures for continued sale of these vehicles.

133.   Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

134.   Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All persons who purchased or leased a Ford vehicle whose published EPA fuel economy ratings, as printed on the vehicles' window sticker, were more than the fuel economy rating produced by a properly conducted applicable federal mileage test. The vehicles in the Class include but are not limited to the model year 2019 Ford Ranger and the 2018 and 2019 Ford F-150.

The class is likely to also include other vehicles, as well as other model year vehicles.  Plaintiffs reserve the right to amend the proposed class after additional information is received from Ford Motor Company in discovery.

135.   Excluded from the Class are individuals who have personal injury claims resulting from the high emissions in the Coastdown Cheating Vehicles. Also excluded from the Class are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

136.   Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

137.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

138.   <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are in excess of an estimated 1,000,000 or more vehicles in the Class. The precise number of Class members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination

methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

139.  <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)  Whether Ford engaged in the conduct alleged herein;

b)  Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Coastdown Cheating Vehicles into the stream of commerce in the United States;

c)  Whether Ford provided false information to consumers regarding the fuel efficiency and emissions of the Coastdown Cheating Vehicles;

d)  Whether Ford provided false information to the EPA regarding the fuel efficiency and emissions of the Coastdown Cheating Vehicles;

e)  Whether Ford knew, and for how long, that the testing certifying the fuel efficiency and emissions of the Coastdown Cheating Vehicles was tainted by inaccurate information;

f)  Whether Ford intentionally designed, manufactured, marketed, and distributed Coastdown Cheating Vehicles with misleading fuel efficiency and emissions ratings;

g)  Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

140.   Typicality: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

141.   Adequacy: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. Plaintiffs' counsel have been pioneers in uncovering emissions misconduct, including doing so in the diesel Ford, Mercedes, General Motors, and FCA emissions cases. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

142.   Superiority: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Classes to individually seek redress for Ford's wrongful conduct. Even if Class members

could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT 1

### VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT
### (GA. CODE ANN. § 10-1-390 *et seq.*)

143.   Plaintiff Jamar Haynes hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

144.   This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiff will amend the complaint to bring this claim on behalf of Georgia purchasers who are members of the Class.

145.   The Georgia Fair Business Practices Act (Georgia FBPA) declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE ANN. § 101-393(b), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or

services with intent not to sell them as advertised and certified." GA. CODE ANN. § 10-1-393(b).

146.    Plaintiff and Georgia Class members are "consumers" within the meaning of GA. CODE ANN. § 10-1-393(b).

147.    Ford engaged in "trade or commerce" within the meaning of GA. CODE ANN. § 10-1-393(b).

148.    Once the statutory notice period has expired, Plaintiff will amend to seek damages and exemplary damages (for intentional violations) per GA. CODE ANN. § 10-1-399(a).

149.    Plaintiff will also amend to seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per GA. CODE ANN. § 10-1-399.

150.    On June 20, 2019, Plaintiffs sent a letter complying with GA. CODE ANN. § 10-1-399(b) to Ford.

## COUNT 2

## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
## (GA. CODE ANN § 10-1-370 *et seq.*)

151.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

152.  This claim is brought by Plaintiff on behalf of Georgia purchasers who are members of the Class.

153.  Georgia's Uniform Deceptive Trade Practices Act (Georgia UDTPA) prohibits "deceptive trade practices," which include "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised and certified." GA. CODE ANN. § 10-1-393(b).

154.  Ford, Plaintiff, and Georgia Class members are "persons" within the meaning of GA. CODE ANN. § 10-1-371(5).

155.  Plaintiff seeks an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

## COUNT 3

### BREACH OF CONTRACT
### (BASED ON GEORGIA LAW)

156.  Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

157.  This claim is brought by the Georgia Plaintiff on behalf of Georgia purchasers who are members of the Class.

158.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other Georgia Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Georgia Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the other Georgia Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

159.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other Georgia Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

160.   As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 4

### FRAUDULENT CONCEALMENT
### (BASED ON GEORGIA LAW)

161.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

162.   This claim is brought by the Georgia Plaintiff on behalf of Georgia purchasers who are members of the Class.

163.   Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other Georgia Class members information that is highly relevant to their purchasing decision.

164.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no

significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

165.   Ford knew these representations were false when made.

166.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

167.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other Georgia Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

168.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

169.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the Georgia Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and Georgia Class members.

170.   Plaintiff and Georgia Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and Georgia Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and Georgia Class members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

171.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and Georgia Class members placed in its representations.

172.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Plaintiff and Georgia Class members,

highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

173.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or Georgia Class members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Plaintiff and Georgia Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Plaintiff and Georgia Class members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Plaintiff and Georgia Class members that they were purchasing or leasing fuel efficient

vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

174.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiff and Georgia Class members.

175.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and Georgia Class members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

176.   Plaintiff and Georgia Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Georgia Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Georgia Class members.

177.   Accordingly, Ford is liable to Plaintiff and Georgia Class members for damages in an amount to be proven at trial.

178.   Ford's acts were done wantonly, maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and

Georgia Class members' rights and the representations that Ford made to them

were made in order to enrich Ford. Ford's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which

amount is to be determined according to proof.

### COUNT 5

**VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, *ET SEQ.* AND 720 ILCS 295/1A)**

179.   Plaintiff Cassandra Morrison incorporates by reference all paragraphs

as though fully set forth herein.

180.   This claim is brought on behalf of the Illinois Class members.

181.   Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

182.   Plaintiff and the Illinois Class members are "consumers" as that term

is defined in 815 ILCS 505/1(e).

183.   The Illinois Consumer Fraud and Deceptive Business Practices Act

(Illinois CFA) prohibits "unfair or deceptive acts or practices, including but not

limited to the use or employment of any deception, fraud, false pretense, false

promise, misrepresentation or the concealment, suppression or omission of any

material fact, with intent that others rely upon the concealment, suppression or

omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

184.   In the course of Ford's business, it willfully failed to disclose and actively concealed that the Coastdown Cheating Vehicles have much lower fuel economy than represented or than a reasonable consumer would expect in light of Ford's advertising campaign, and that the Coastdown Cheating Vehicles contain a fuel efficiency cheat device. Accordingly, Ford engaged in unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact in the conduct of trade or commerce as prohibited by the Illinois CFA.

185.   In purchasing or leasing the Coastdown Cheating Vehicles, Plaintiff and the other Illinois Class members were deceived by Ford's failure to disclose the actual fuel economy or presence of a cheat device in the Coastdown Cheating Vehicles.

186.   Plaintiff and Illinois Class members reasonably relied upon Ford's false misrepresentations. They had no way of knowing that Ford's representations were false and gravely misleading. As alleged herein, Ford engaged in extremely

sophisticated methods of deception. Plaintiff and Illinois Class members did not, and could not, unravel Ford's deception on their own.

187.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

188.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

189.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with an intent to mislead Plaintiff and the Class.

190.   Ford knew or should have known that its conduct violated the Illinois CFA.

191.   Ford owed Plaintiff and the Class a duty to disclose the truth about its fuel certification manipulation because Ford:

> a.   Possessed exclusive knowledge that it manipulated the testing, certification, and onboard vehicle reporting of fuel efficiency;
>
> b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or
>
> c.   Made incomplete representations that it manipulated the certification testing and failed to disclose the true fuel economy or presence of a fuel efficiency cheat device in the Coastdown Cheating Vehicles, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

192.   Ford had a duty to disclose that the Coastdown Cheating Vehicles not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other Illinois Class members relied on Ford's material representations that the Coastdown Cheating Vehicles they were purchasing were fuel efficient, and free from defects.

193.   Ford's conduct proximately caused injuries to Plaintiff and the other Illinois Class members.

194.   Plaintiff and the other Illinois Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Ford's conduct in that Plaintiff and the other Illinois Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain, and their Coastdown Cheating Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations and omissions.

195.   Ford's violations present a continuing risk to Plaintiff as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

196.   Pursuant to 815 ILCS 505/10a(a), Plaintiff and the Illinois Class members seek monetary relief against Ford in the amount of actual damages, as well as punitive damages because Ford acted with fraud and/or malice and/or was grossly negligent.

197.   Plaintiff also seeks punitive damages, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1, *et seq*. A copy of this Complaint has been mailed to the Attorney General of the State of Illinois in accordance with 815 ILCS 505/10a(d).

## COUNT 6

## BREACH OF CONTRACT
## (BASED ON ILLINOIS LAW)

198.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

199.   This claim is brought by the Illinois Plaintiff on behalf of Illinois purchasers who are members of the Class.

200.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other Illinois members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Illinois Class members would not have purchased

or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the other Illinois Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

201.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other Illinois Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

202.   As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 7

## FRAUDULENT CONCEALMENT
## (BASED ON ILLINOIS LAW)

203.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

204.   This claim is brought by the Illinois Plaintiff on behalf of Illinois purchasers who are members of the Class.

205.   Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other Illinois Class members information that is highly relevant to their purchasing decision.

206.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

207.   Ford knew these representations were false when made.

208.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

209.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other Illinois Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

210.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

211.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the Illinois Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and Illinois Class members.

212.    Plaintiff and Illinois Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and Illinois Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and Illinois Class members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

213.    Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and Illinois Class members placed in its representations.

214.    Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Plaintiff and Illinois Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

215.    Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage

is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or Illinois Class members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Plaintiff and Illinois Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Plaintiff and Illinois Class members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Plaintiff and Illinois Class members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

216.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its

vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiff and Illinois Class members.

217.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and Illinois Class members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

218.   Plaintiff and Illinois Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Illinois Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Illinois Class members.

219.   Accordingly, Ford is liable to Plaintiff and Illinois Class members for damages in an amount to be proven at trial.

220.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Illinois Class members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount

is to be determined according to proof.

## COUNT 8

### VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (LA. REV. STAT. § 51:1401 *et seq.*)

221.   Plaintiff Benjamin Bischoff realleges and incorporates by reference all

paragraphs as though fully set forth herein.

222.   This claim is brought by Plaintiff on behalf of Louisiana purchasers

who are members of the Class

223.   Ford, Plaintiff, and the Louisiana Class members are "persons" within

the meaning of LA. REV. STAT. § 51:1402(8).

224.   Plaintiff and Louisiana Class members are "consumers" within the

meaning of LA. REV. STAT. § 51:1402(1).

225.   Ford engaged in "trade" or "commerce" within the meaning of LA.

REV. STAT. § 51:1402(9).

226.   The Louisiana Unfair Trade Practices and Consumer Protection Law

(Louisiana CPL) makes unlawful "deceptive acts or practices in the conduct of any

trade or commerce." LA. REV. STAT. § 51:1405(A). Ford participated in

misleading, false, or deceptive acts that violated the Louisiana CPL.

227.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of Coastdown Cheating Vehicles.

228.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

229.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Plaintiff and the Louisiana Class.

230.   Ford knew or should have known that its conduct violated the Louisiana CPL.

231.   Ford owed Plaintiff a duty to disclose the emissions in the Coastdown Cheating Vehicles, because Ford:

    a.   Possessed exclusive knowledge;

    b.   Intentionally concealed the foregoing from Plaintiffs; and/or

    c.   Made incomplete representations about the fuel efficiency and performance of the Coastdown Cheating Vehicles, while purposefully withholding material facts from Plaintiff that contradicted these representations, and including a mileage cheat device that actively and continually misrepresents

the fuel economy of the Coastdown Cheating
Vehicles.

232.   Plaintiff and the Louisiana Class suffered ascertainable loss caused by

Ford's misrepresentations and its concealment of and failure to disclose material

information.

233.   As a direct and proximate result of Ford's violations of the Louisiana

CPL, Plaintiff and the Louisiana Class have suffered injury-in-fact and/or actual

damage.

234.   Pursuant to LA. REV. STAT. § 51:1409, Plaintiff and the Louisiana

Class seek to recover actual damages in an amount to be determined at trial; treble

damages for Ford's knowing violations of the Louisiana CPL; an order enjoining

Ford's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys'

fees; and any other just and proper relief available under LA. REV. STAT.

§ 51:1409.

## COUNT 9

## BREACH OF CONTRACT
## (BASED ON LOUISIANA LAW)

235.   Plaintiff incorporates by reference all paragraphs as though fully set

forth herein.

236.   This claim is brought by the Louisiana Plaintiff on behalf of Louisiana

purchasers who are members of the Class.

237.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other Louisiana Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Louisiana Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the other Louisiana Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

238.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other Louisiana Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

239.   As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 10

### FRAUDULENT CONCEALMENT
### (BASED ON LOUISIANA LAW)

240.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

241.   This claim is brought by the Louisiana Plaintiff on behalf of Louisiana purchasers who are members of the Class.

242.   Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other Louisiana Class members information that is highly relevant to their purchasing decision.

243.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no

significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

244.   Ford knew these representations were false when made.

245.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

246.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other Louisiana Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

247.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

248.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the Louisiana Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and Louisiana Class members.

249.   Plaintiff and Louisiana Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and Louisiana Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and Louisiana Class members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

250.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and Louisiana Class members placed in its representations.

251.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Plaintiff and Louisiana Class

members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

252.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or Louisiana Class members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Plaintiff and Louisiana Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Plaintiff and Louisiana Class members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Plaintiff and Louisiana Class members that they were purchasing or leasing fuel

efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

253.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiff and Louisiana Class members.

254.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and Louisiana Class members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

255.   Plaintiff and Louisiana Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Louisiana Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Louisiana Class members.

256.   Accordingly, Ford is liable to Plaintiff and Louisiana Class members for damages in an amount to be proven at trial.

257.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Louisiana Class members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 11

### VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT (NEB. REV. STAT. § 59-1601 *et seq.*)

258.   Plaintiff Scott Whitehill hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

259.   This claim is brought by Plaintiff on behalf of Nebraska purchasers who are members of the Class.

260.   The Nebraska Consumer Protection Act (Nebraska CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." NEB. REV. STAT. § 59-1602.

261.   Ford, Plaintiff, and Nebraska Class members are "person[s]" under NEB. REV. STAT. § 59-1601(1).

262.   Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under NEB. REV. STAT. § 59-1601(2).

263.   Because Ford's conduct caused injury to Plaintiff's property through violations of the Nebraska CPA, Plaintiff seeks recovery of actual damages as well as enhanced damages up to $1,000, an order enjoining Ford's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under NEB. REV. STAT. § 59-1609.

## COUNT 12

## BREACH OF CONTRACT
## (BASED ON NEBRASKA LAW)

264.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

265.   This claim is brought by the Nebraska Plaintiff on behalf of Nebraska purchasers who are members of the Class.

266.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiffs and the other Nebraska Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Nebraska Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not

have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the other Nebraska Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

267.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other Nebraska Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

268.   As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 13

## FRAUDULENT CONCEALMENT
## (BASED ON NEBRASKA LAW)

269.   Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

270.   This claim is brought by Plaintiff on behalf of Nebraska purchasers who are members of the Class.

271.   Ford concealed and suppressed material facts concerning the quality of its vehicles and the fuel economy of the Coastdown Cheating Vehicles.

272.   Because of the concealment and/or suppression of the facts, and the inclusion of a mileage cheat device, Plaintiff and the Nebraska Class sustained damage because they overpaid for their vehicles and own vehicles that diminished in value as a result of Ford's concealment, and suffered and continue to suffer increased fuel costs over what was represented by Ford. Had they been aware of the true facts, Plaintiff and Class members would not have purchased or leased the Coastdown Cheating Vehicles or would have paid less.

## COUNT 14

## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT
## (OHIO REV. CODE ANN. § 1345.01 *ET SEQ.*)

273.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

274.   This claim is brought by Plaintiffs on behalf of Ohio purchasers who are members of the Class.

275.   Ohio Consumer Sales Practices Act (Ohio CSPA), OHIO REV. CODE ANN. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits (1) representing that Coastdown Cheating Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Coastdown Cheating Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Coastdown Cheating Vehicles with the intent not to sell them as advertised and certified, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer. OHIO REV. CODE ANN. § 1345.02.

276.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Ford in this Complaint, including but not limited to the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

a.   *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b.   *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c.   *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d.   *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e.   *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f.   *State ex rel. Jim Petro v. Craftmatic Org., Inc.* (OPIF #10002347);

g.   *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h.   *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i.   *Brinkman v. Mazda Motor of Am., Inc.* (OPIF #10001427);

j.   *Khouri v. Don Lewis* (OPIF #100001995);

k.   *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l.   *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m.   *Brown v. Spears* (OPIF #10000403).

277.   Ford is a "supplier" as that term is defined in OHIO REV. CODE ANN. § 1345.01(C).

278.   Plaintiffs and Ohio Class members are "consumers" as that term is defined in OHIO REV. CODE ANN. § 1345.01(D), and their purchase or lease of one

or more Coastdown Cheating Vehicles is a "consumer transaction" within the meaning of OHIO REV. CODE ANN. § 1345.01(A).

279.   As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial and seek all just and proper remedies, including but not limited to actual and statutory damages, an order enjoining Ford's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to OHIO REV. CODE ANN. § 1345.09 *et seq.*

## COUNT 15

## BREACH OF CONTRACT
## (BASED ON OHIO LAW)

280.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

281.   This claim is brought by the Ohio Plaintiff on behalf of Ohio purchasers who are members of the Class.

282.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other Ohio members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Ohio Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased

the Coastdown Cheating Vehicles at the prices they paid, and/or would have

purchased or leased less expensive alternative vehicles that did not contain the

reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the

other Ohio Class members overpaid for the Coastdown Cheating Vehicles and did

not receive the benefit of their bargain.

283.   Each and every sale or lease of a Coastdown Cheating Vehicle

constitutes a contract between Ford and the purchaser or lessee. Ford breached

these contracts by selling or leasing to Plaintiff and the other Ohio Class members

defective Coastdown Cheating Vehicles and by misrepresenting or failing to

disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency

that was advertised and certified, and their mileage is far worse than a reasonable

consumer would expect given the premium paid for these vehicles and the

representation made by Ford.

284.   As a direct and proximate result of Ford's breach of contract, Plaintiff

and the Class have been damaged in an amount to be proven at trial, which shall

include, but is not limited to, all compensatory damages, incidental and

consequential damages, and other damages allowed by law.

## COUNT 16

## FRAUDULENT CONCEALMENT
## (BASED ON OHIO LAW)

285.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

286.   This claim is brought by the Ohio Plaintiff on behalf of Ohio purchasers who are members of the Class.

287.   Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other Ohio Class members information that is highly relevant to their purchasing decision.

288.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

289.   Ford knew these representations were false when made.

290.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

291.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other Ohio Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

292.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

293.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the Ohio Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and Ohio Class members.

294.   Plaintiff and Ohio Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and Ohio Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and Ohio Class members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

295.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and Ohio Class members placed in its representations.

296.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Plaintiff and Ohio Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

297.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage

is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or Ohio Class members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Plaintiff and Ohio Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Plaintiff and Ohio Class members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Plaintiff and Ohio Class members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

298.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its

vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiff and Ohio Class members.

299.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and Ohio Class members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

300.   Plaintiff and Ohio Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Ohio Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Ohio Class members.

301.   Accordingly, Ford is liable to Plaintiff and Ohio Class members for damages in an amount to be proven at trial.

302.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Ohio Class members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive

damages in an amount sufficient to deter such conduct in the future, which amount

is to be determined according to proof.

## COUNT 17

## VIOLATION OF THE SOUTH CAROLINA
## UNFAIR TRADE PRACTICES ACT
### (S.C. CODE ANN. § 39-5-10 *et seq.*)

303.   Plaintiff Matthew Brownlee hereby incorporates by reference the

allegations contained in the preceding paragraphs of this complaint.

304.   This claim is brought by Plaintiff on behalf of South Carolina

purchasers who are members of the Class.

305.   The South Carolina Unfair Trade Practices Act (South Carolina

UTPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade

or commerce." S.C. CODE ANN. § 39-5-20(a).

306.   Ford is a "person" under S.C. CODE ANN. § 39-5-10.

307.   Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiff seeks monetary

relief to recover their economic losses. Because Ford's actions were willful and

knowing, Plaintiffs' damages should be trebled.

308.   Plaintiff further alleges that Ford's malicious and deliberate conduct

warrants an assessment of punitive damages because it carried out despicable

conduct with willful and conscious disregard of the rights of others. Ford's

unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

309.   Plaintiff further seeks an order enjoining each Ford's unfair or deceptive acts or practices.

## COUNT 18

## BREACH OF CONTRACT
## (BASED ON SOUTH CAROLINA LAW)

310.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

311.   This claim is brought by the South Carolina Plaintiff on behalf of South Carolina purchasers who are members of the Class.

312.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other South Carolina Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other South Carolina Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device.

Accordingly, Plaintiff and the other South Carolina Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

313.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other South Carolina Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

314.   As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 19

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH CAROLINA LAW)

315.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

316.   This claim is brought by the South Carolina Plaintiff on behalf of South Carolina purchasers who are members of the Class.

317.   Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other South Carolina Class members information that is highly relevant to their purchasing decision.

318.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

319.   Ford knew these representations were false when made.

320.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

321.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other

South Carolina Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

322.    As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

323.    The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the South Carolina Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and South Carolina Class members.

324.    Plaintiff and South Carolina Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and South Carolina Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and South Carolina Class members by

concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

325.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and South Carolina Class members placed in its representations.

326.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Plaintiff and South Carolina Class members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

327.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to

or reasonably discoverable by Plaintiff or South Carolina Class members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Plaintiff and South Carolina Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Plaintiff and South Carolina Class members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Plaintiff and South Carolina Class members that they were purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

328.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiff and South Carolina Class members.

329.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and South Carolina Class members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

330.   Plaintiff and South Carolina Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and South Carolina Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or South Carolina Class members.

331.   Accordingly, Ford is liable to Plaintiff and South Carolina Class members for damages in an amount to be proven at trial.

332.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and South Carolina Class members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 20

## VIOLATION OF THE SOUTH DAKOTA DECEPTIVE
## TRADE PRACTICES AND CONSUMER PROTECTION LAW
## (S.D. CODIFIED LAWS § 37-24-6)

333.   Plaintiff Robert Raney hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

334.   This claim is brought by Plaintiff on behalf of South Dakota purchasers who are members of the Class.

335.   The South Dakota Deceptive Trade Practices and Consumer Protection Law (South Dakota CPL) prohibits deceptive acts or practices, which include "[k]nowingly act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. CODIFIED LAWS §§ 37-24-6(1), 37-24-31.

336.   Under S.D. CODIFIED LAWS § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of Ford's acts and practices.

## COUNT 21

## BREACH OF CONTRACT
## (BASED ON SOUTH DAKOTA LAW)

337.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

338.   This claim is brought by the South Dakota Plaintiff on behalf of South Dakota purchasers who are members of the Class.

339.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other South Dakota Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other South Dakota Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the other South Dakota Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

340.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other South Dakota Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a

reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

341.    As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 22

## FRAUDULENT CONCEALMENT
## (BASED ON SOUTH DAKOTA LAW)

342.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

343.    This claim is brought by the South Dakota Plaintiff on behalf of South Dakota purchasers who are members of the Class.

344.    Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other South Dakota Class members information that is highly relevant to their purchasing decision.

345.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

346.   Ford knew these representations were false when made.

347.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

348.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other South Dakota Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

349.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence

of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

350.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the South Dakota Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and South Dakota Class members.

351.   Plaintiff and South Dakota Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and South Dakota Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and South Dakota Class members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

352.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and South Dakota Class members placed in its representations.

353.    Ford's false representations were material to consumers, because they

concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also

because the representations played a significant role in the value of the vehicles.

As Ford well knew, its customers, including Plaintiff and South Dakota Class

members, highly valued that the vehicles they were purchasing or leasing were fuel

efficient, and they paid accordingly.

354.    Ford had a duty to disclose that the Coastdown Cheating Vehicles do

not provide the fuel efficiency that was advertised and certified, and their mileage

is far worse than a reasonable consumer would expect given the premium paid for

these vehicles and the representation made by Ford, because details of the true

facts were known and/or accessible only to Ford, because Ford had exclusive

knowledge as to such facts, and because Ford knew these facts were not known to

or reasonably discoverable by Plaintiff or South Dakota Class members. Ford also

had a duty to disclose because it made general affirmative representations about

the qualities of its vehicles with respect to fuel efficiency, which were misleading,

deceptive, and incomplete without the disclosure of the additional facts set forth

above regarding the actual mileage of its vehicles.  Having volunteered to provide

information to Plaintiff and South Dakota Class members, Ford had the duty to

disclose not just the partial truth, but the entire truth. These omitted and concealed

facts were material because they directly impact the value of the Coastdown

Cheating Vehicles purchased or leased by Plaintiff and South Dakota Class

members. Whether an automobile is fuel efficient and whether it accurately

measures its own gasoline consumption are material concerns to a consumer. Ford

represented to Plaintiff and South Dakota Class members that they were

purchasing or leasing fuel efficient vehicles, when in fact the Coastdown Cheating

Vehicles do not perform as advertised and certified and do not accurately report

their own fuel consumption.

355.   Ford actively concealed and/or suppressed these material facts, in

whole or in part, to pad and protect its profits and to avoid the perception that its

vehicles were not fuel efficient or low emissions, which perception would hurt the

brand's image and cost Ford money, and it did so at the expense of Plaintiff and

South Dakota Class members.

356.   Ford has still not made full and adequate disclosures and continues to

defraud Plaintiff and South Dakota Class members by concealing material

information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

357.   Plaintiff and South Dakota Class members were unaware of the

omitted material facts referenced herein, and they would not have acted as they did

if they had known of the concealed and/or suppressed facts, in that they would not

have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or

would have taken other affirmative steps in light of the information concealed from

them. Plaintiff's and South Dakota Class members' actions were justified. Ford

was in exclusive control of the material facts, and such facts were not generally

known to the public, Plaintiff, or South Dakota Class members.

358.   Accordingly, Ford is liable to Plaintiff and South Dakota Class

members for damages in an amount to be proven at trial.

359.   Ford's acts were done wantonly, maliciously, oppressively,

deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and

South Dakota Class members' rights and the representations that Ford made to

them were made in order to enrich Ford. Ford's conduct warrants an assessment of

punitive damages in an amount sufficient to deter such conduct in the future, which

amount is to be determined according to proof.

## COUNT 23

### VIOLATION OF THE WISCONSIN
### DECEPTIVE TRADE PRACTICES ACT
### (WIS. STAT. § 110.18)

360.   Plaintiff Steven Leszczynski hereby incorporates by reference the

allegations contained in the preceding paragraphs of this complaint.

361.   This claim is brought by Plaintiff on behalf of Wisconsin purchasers

who are members of the Class.

362.   The Wisconsin Deceptive Trade Practices Act (Wisconsin DTPA) prohibits a "representation or statement of fact which is untrue, deceptive or misleading." WIS. STAT. § 100.18(1).

363.   Ford is a "person, firm, corporation or association" within the meaning of WIS. STAT. § 100.18(1).

364.   Plaintiff and Wisconsin Class members are members of "the public" within the meaning of WIS. STAT. § 100.18(1). Plaintiff purchased or leased one or more Coastdown Cheating Vehicles.

365.   Plaintiff is entitled to damages and other relief provided for under WIS. STAT. § 100.18(11)(b)(2). Because Ford's conduct was committed knowingly and/or intentionally, Plaintiff is entitled to treble damages.

366.   Plaintiff also seeks court costs and attorneys' fees under WIS. STAT. § 110.18(11)(b)(2).

## COUNT 24

### BREACH OF CONTRACT
### (BASED ON WISCONSIN LAW)

367.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

368.   This claim is brought by the Wisconsin Plaintiff on behalf of Wisconsin purchasers who are members of the Class.

369.   Ford's misrepresentations and omissions alleged herein, including Ford's failure to disclose the existence of the Coastdown Cheating Vehicles' onboard fuel efficiency cheat device and lower fuel economy than advertised and certified, caused Plaintiff and the other Wisconsin Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiff and the other Wisconsin Class members would not have purchased or leased the Coastdown Cheating Vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the reduced mileage or fuel efficiency cheat device. Accordingly, Plaintiff and the other Wisconsin Class members overpaid for the Coastdown Cheating Vehicles and did not receive the benefit of their bargain.

370.   Each and every sale or lease of a Coastdown Cheating Vehicle constitutes a contract between Ford and the purchaser or lessee. Ford breached these contracts by selling or leasing to Plaintiff and the other Wisconsin Class members defective Coastdown Cheating Vehicles and by misrepresenting or failing to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

371.   As a direct and proximate result of Ford's breach of contract, Plaintiff and the Class have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT 25

## FRAUDULENT CONCEALMENT
## (BASED ON WISCONSIN LAW)

372.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

373.   This claim is brought by the Wisconsin Plaintiff on behalf of Wisconsin purchasers who are members of the Class.

374.   Ford intentionally concealed the fact that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, and Ford acted with reckless disregard for the truth and denied Plaintiff and the other Wisconsin Class members information that is highly relevant to their purchasing decision.

375.   Ford further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car that the Coastdown Cheating Vehicles it was selling had no

significant defects, had the advertised and certified fuel efficiency, and did not reveal the existence of a mileage cheat device.

376.   Ford knew these representations were false when made.

377.   The Coastdown Cheating Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, with reduced fuel efficiency and a fuel efficiency cheat device.

378.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because Plaintiff and the other Wisconsin Class members relied on Ford's material representations or omissions of fact that the Coastdown Cheating Vehicles they were purchasing were fuel efficient and free from defects.

379.   As alleged in this Complaint, at all relevant times, Ford has held out the Coastdown Cheating Vehicles to be fuel efficient. Ford disclosed certain details about the Coastdown Cheating Vehicles, but nonetheless, Ford intentionally failed to disclose the important facts concerning the lack of fuel efficiency and existence of a fuel efficiency cheat device, making other disclosures about the fuel efficiency deceptive.

380.   The truth about the lack of fuel efficiency and Ford's manipulations of certifications and inclusion of a fuel efficiency defeat device was known only to Ford; Plaintiff and the Wisconsin Class members did not know of these facts and Ford actively concealed these facts from Plaintiff and Wisconsin Class members.

381.   Plaintiff and Wisconsin Class members reasonably relied upon Ford's deception. They had no way of knowing that Ford's representations were false and/or misleading. As consumers, Plaintiff and Wisconsin Class members did not, and could not, unravel Ford's deception on their own. Rather, Ford intended to deceive Plaintiff and Wisconsin Class members by concealing the true facts about the Coastdown Cheating Vehicles' lack of fuel efficiency.

382.   Ford also concealed and suppressed material facts concerning what is evidently the true culture of Ford—one characterized by an emphasis on profits and sales above compliance with federal and state clean air laws and emissions regulations that are meant to protect the public and consumers. It also emphasized profits and sales above the trust that Plaintiff and Wisconsin Class members placed in its representations.

383.   Ford's false representations were material to consumers, because they concerned the fuel efficiency of the Coastdown Cheating Vehicles, and also because the representations played a significant role in the value of the vehicles. As Ford well knew, its customers, including Plaintiff and Wisconsin Class

members, highly valued that the vehicles they were purchasing or leasing were fuel efficient, and they paid accordingly.

384.   Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford, because details of the true facts were known and/or accessible only to Ford, because Ford had exclusive knowledge as to such facts, and because Ford knew these facts were not known to or reasonably discoverable by Plaintiff or Wisconsin Class members. Ford also had a duty to disclose because it made general affirmative representations about the qualities of its vehicles with respect to fuel efficiency, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual mileage of its vehicles.  Having volunteered to provide information to Plaintiff and Wisconsin Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Coastdown Cheating Vehicles purchased or leased by Plaintiff and Wisconsin Class members. Whether an automobile is fuel efficient and whether it accurately measures its own gasoline consumption are material concerns to a consumer. Ford represented to Plaintiff and Wisconsin Class members that they were purchasing or leasing fuel

efficient vehicles, when in fact the Coastdown Cheating Vehicles do not perform as advertised and certified and do not accurately report their own fuel consumption.

385.   Ford actively concealed and/or suppressed these material facts, in whole or in part, to pad and protect its profits and to avoid the perception that its vehicles were not fuel efficient or low emissions, which perception would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiff and Wisconsin Class members.

386.   Ford has still not made full and adequate disclosures and continues to defraud Plaintiff and Wisconsin Class members by concealing material information regarding the fuel efficiency of its Coastdown Cheating Vehicles.

387.   Plaintiff and Wisconsin Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly fuel efficient vehicles manufactured by Ford, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and Wisconsin Class members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Wisconsin Class members.

388.   Accordingly, Ford is liable to Plaintiff and Wisconsin Class members for damages in an amount to be proven at trial.

389.   Ford's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and Wisconsin Class members' rights and the representations that Ford made to them were made in order to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## A.   Claims brought on behalf of the other state classes

### COUNT 26

### VIOLATION OF THE ALABAMA
### DECEPTIVE TRADE PRACTICES ACT
### (ALA. CODE § 8-19-1 *et seq.*)

390.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

391.   This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of Alabama purchasers who are members of the Class.

392.   The Alabama Deceptive Trade Practices Act (Alabama DTPA) declares several specific actions to be unlawful, including: "engaging in any other

unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." ALA. CODE § 8-19-5.

393.   Plaintiffs and Alabama Class members are "consumers" within the meaning of ALA. CODE. § 8-19-3(2).

394.   Plaintiffs, Alabama Class members, and Ford are "persons" within the meaning of ALA. CODE § 8-19-3(3).

395.   Ford was and is engaged in "trade or commerce" within the meaning of ALA. CODE § 8-19-3(8).

396.   Pursuant to ALA. CODE § 8-19-10, Plaintiffs will amend to seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

397.   Plaintiffs also will amend to seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under ALA. CODE. § 8-19-1, *et seq.*

398.   On June 20, 2019, Plaintiffs sent a letter complying with ALA. CODE § 8-19-10(e) to Ford. Should Ford fail to remedy its unlawful conduct within the requisite period, Plaintiff will amend to seek all damages and relief to which they are entitled.

**COUNT 27**

**VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION ACT
(ALASKA STAT. ANN. § 45.50.471 *et seq.*)**

399.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

400.    This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of Alaska purchasers who are members of the Class.

401.    The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce unlawful, including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." ALASKA STAT. ANN. § 45.50.471.

402.    Pursuant to ALASKA STAT ANN. § 45.50.531, Plaintiffs will amend their Complaint to seek monetary relief against Ford measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each plaintiff.

403.   Plaintiffs also will amend to seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices pursuant to ALASKA STAT. ANN. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

404.   Plaintiffs sent a letter on June 20, 2019 complying with ALASKA STAT. ANN. § 45.50.535(b)(1) to Ford.

## COUNT 28

## VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT
### (ARIZONA REV. STAT. § 44-1521 *et seq.*)

405.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

406.   This claim is brought by Plaintiffs on behalf of Arizona purchasers who are members of the Class.

407.   The Arizona Consumer Fraud Act (Arizona CFA) provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A). Ford failed to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was

advertised and certified, they contain a mileage cheat device that continually lies to the consumer, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

408. Ford, Plaintiffs, and Arizona Class members are "persons" within the meaning of the Arizona CFA, ARIZ. REV. STAT. § 44-1521(6).

409. Each Coastdown Cheating Vehicle at issue is "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

410. Ford's conduct, as set forth above, occurred in the conduct of trade or commerce.

411. Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Plaintiffs also seek punitive damages because Ford engaged in aggravated and outrageous conduct with an evil mind.

412. Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT 29

## VIOLATION OF THE ARKANSAS
## DECEPTIVE TRADE PRACTICES ACT
## (ARK. CODE ANN. § 4-88-101 *et seq.*)

413.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

414.   This claim is brought by Plaintiffs on behalf of Arkansas purchasers who are members of the class.

415.   The Arkansas Deceptive Trade Practices Act (Arkansas DTPA) prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade." ARK. CODE. ANN. § 4-88-107(a)(10). The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "(1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." ARK CODE. ANN. § 4-88-108. Ford failed to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

416.   Ford, Plaintiffs, and Arkansas Class members are "persons" within the meaning of ARK. CODE. ANN. § 4-88-102(5).

417.   Each Coastdown Cheating Vehicle at issue constitutes "goods" within the meaning of ARK. CODE ANN. § 4-88-102(4).

418.   Plaintiffs seek monetary relief against Ford in an amount to be determined at trial. Plaintiffs also seek punitive damages because Ford acted wantonly in causing Plaintiffs' and Arkansas Class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

419.   Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT 30

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*)

420.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

421.   This claim is brought by the California Plaintiffs on behalf of California purchasers who are members of the Class.

422.   California's Unfair Competition Law (UCL), CAL. BUS. & PROF. CODE § 17200 *et seq.*, proscribes acts of unfair competition, including "any

unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

423.   Ford's conduct, as described herein, was and is in violation of the UCL. Ford's conduct violates the UCL in at least the following ways:

i.      By failing to disclose that the Coastdown Cheating Vehicles do not achieve the MPGs listed on the Monroney sticker or Ford's advertising;

ii.     By knowingly and intentionally concealing from Plaintiffs and the other California Class members that the Coastdown Cheating Vehicles contain reported MPGs via a Coastdown Cheating process that do not achieve the MPGs listed on the Monroney sticker, do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles;

iii.    By failing to disclose that fuel economy is achieved with manipulation of the computer trip meter;

iv.     By marketing the Coastdown Cheating Vehicles as fuel efficient vehicles; and

v.      By violating other California laws, including California consumer protection laws.

424.    Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with an intent to mislead Plaintiffs and the Class.

425.    In purchasing or leasing the Coastdown Cheating Vehicles, Plaintiffs and the other California Class members were deceived by Ford's failure to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the representation made by Ford.

426.    Plaintiffs and California Class members reasonably relied upon Ford's false misrepresentations. They had no way of knowing that Ford's representations were false and gravely misleading. As alleged herein, Ford engaged in extremely sophisticated methods of deception. Plaintiffs and California Class members did not, and could not, unravel Ford's deception on their own.

427.    Ford knew or should have known that its conduct violated the UCL.

428.    Ford owed Plaintiffs and the Class a duty to disclose the truth about its fuel efficiency manipulation because Ford:

i.      Possessed exclusive knowledge that it manipulated the certification testing and onboard display of mileage;

ii.     Intentionally concealed the foregoing from Plaintiffs and the Class; and/or

iii.    Made incomplete representations that it manipulated the certification testing and onboard display of mileage in the Coastdown Cheating Vehicles to misrepresent the fuel economy, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

429.    Ford had a duty to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

430.    Ford's conduct proximately caused injuries to Plaintiffs and the other California Class members.

431.    Plaintiffs and the other California Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Ford's conduct in that Plaintiffs and the other California Class members overpaid for the Coastdown Cheating Vehicles, and/or the Coastdown Cheating Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations and omissions.

432.    Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

433.   Ford's misrepresentations and omissions alleged herein caused Plaintiffs and the other California Class members to make their purchases or leases of the Coastdown Cheating Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other California Class members would not have purchased or leased these vehicles, would not have purchased or leased the Coastdown Cheating Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain the mileage cheat device and reduced fuel economy of the Coastdown Cheating Vehicles.

434.   Accordingly, Plaintiffs and the other California Class members have suffered injury in fact, including lost money or property, as a result of Ford's misrepresentations and omissions.

435.   Plaintiffs request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE § 17203 and CAL. CIV. CODE § 3345; and for such other relief as may be appropriate.

## COUNT 31

### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500 *ET SEQ.*)

436.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

437.   This claim is brought by the California Plaintiffs on behalf of California purchasers who are members of the Class.

438.   CAL. BUS. & PROF. CODE § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Ford failed to disclose that the Coastdown Cheating Vehicles do not provide the fuel efficiency that was advertised and certified, and their mileage is far worse than a reasonable consumer would expect given the premium paid for these vehicles and the representation made by Ford.

439.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and the other California Class members.

440.   Ford has violated § 17500 because the misrepresentations and omissions regarding the functionality and fuel efficiency of the Coastdown Cheating Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

441.   Plaintiffs and the other California Class members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Coastdown Cheating Vehicles, Plaintiffs and the other California Class members relied on the misrepresentations and/or omissions of Ford with respect to the functionality and fuel economy of the Coastdown Cheating Vehicles.  Had Plaintiffs and the other California Class members known this, they would not have purchased or leased the Coastdown Cheating Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other California Class members overpaid for the Coastdown Cheating Vehicles.

442.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

443.   The facts concealed and omitted by Ford to Plaintiffs and the other California Class members are material in that a reasonable consumer would have

considered them to be important in deciding whether to purchase or lease the

Coastdown Cheating Vehicles or pay a lower price. Had Plaintiffs and the other

California Class members known of the lower fuel economy or onboard mileage

cheat device at the time they purchased or leased the Coastdown Cheating

Vehicles, they would not have purchased or leased those vehicles, or would have

paid substantially less for the vehicles than they did.

444.   Plaintiffs have provided Ford with notice of its violations of the

CLRA pursuant to CAL. CIV. CODE § 1782(a). The notice was transmitted to Ford

on June 20, 2019.

445.   Plaintiffs' and the other California Class members' injuries were

proximately caused by Ford's fraudulent and deceptive business practices.

446.   Therefore, Plaintiffs and the other California Class members are

entitled to equitable and monetary relief under the CLRA.

447.   Plaintiffs, individually and on behalf of the other California Class

members, request that this Court enter such orders or judgments as may be

necessary to restore to Plaintiffs and the other California Class members any

money Ford acquired by unfair competition, including restitution and/or

restitutionary disgorgement, and for such other relief as may be appropriate.

## COUNT 32

## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT
### (COLO. REV. STAT. § 6-1-101 *et seq.*)

448.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

449.    This claim is brought by Plaintiffs on behalf of Colorado purchasers who are members of the Class.

450.    The Colorado Consumer Protection Act (Colorado CPA) prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

451.    Ford is a "person" under COLO. REV. STAT. § 6-1-102(6).

452.    Plaintiffs and Colorado Class members are "consumers" for purposes of COLO. REV. STAT § 6-1-113(1)(a).

453.    Ford's conduct, as set forth above, occurred in the conduct of trade or commerce.

454.    Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to

be determined at trial and discretionary trebling of such damages, or (b) statutory

damages in the amount of $500 for each plaintiff or class member.

455.   Plaintiffs also seek an order enjoining Ford's unfair, unlawful, or

deceptive practices, declaratory relief, attorneys' fees, and any other just and

proper remedy under the Colorado CPA.

## COUNT 33

### VIOLATION OF THE CONNECTICUT
### UNFAIR TRADE PRACTICES ACT
### (CONN. GEN. STAT. § 42-110A *et seq.*)

456.   Plaintiffs hereby incorporate by reference the allegations contained in

the preceding paragraphs of this complaint.

457.   This claim is brought by Plaintiffs on behalf of Connecticut

purchasers who are members of the Class.

458.   The Connecticut Unfair Trade Practices Act (Connecticut UTPA)

provides: "No person shall engage in unfair methods of competition and unfair or

deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN.

STAT. § 42-110b(a).

459.   Plaintiffs, Connecticut Class members, and Ford are each a "person"

within the meaning of CONN. GEN. STAT. § 42-110a(3).

460.   Ford's challenged conduct occurred in "trade" or "commerce" within

the meaning of CONN. GEN. STAT. § 42-110a(4).

461.    Plaintiffs and Connecticut Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to CONN. GEN. STAT. § 42-110g.

462.    Ford acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights, and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights of others. Therefore, punitive damages are warranted.

## COUNT 34

### VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT
### (DEL. CODE TIT. 6, § 2513 *et seq.*)

463.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

464.    This claim is brought by Plaintiffs on behalf of Delaware purchasers who are members of the Class.

465.    The Delaware Consumer Fraud Act (Delaware CFA) prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

466.   Ford is a "person" within the meaning of DEL. CODE TIT. 6, § 2511(7).

467.   Ford's actions, as set forth above, occurred in the conduct of trade or commerce.

468.   Plaintiffs seeks damages under the Delaware CFA for injury resulting from the direct and natural consequences of Ford's unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

469.   Ford engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT 35

### VIOLATIONS OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT (FLA. STAT. § 501.201 *ET SEQ.*)

470.   Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

471.   Plaintiffs bring this Count on behalf of the Florida Subclass.

472.   Plaintiffs and the Subclass are "consumers" within the meaning of Florida Unfair and Deceptive Trade Practices Act (Florida UDTPA), FLA. STAT. § 501.203(7).

473.    Defendants engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

474.    Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  FLA. STAT. § 501.204(1).  Defendants participated in unfair and deceptive trade practices that violated the Florida UDTPA as described herein.  Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1).  Defendant's conduct offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and is likely to mislead consumers.

475.    Accordingly, the Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Coastdown Cheating Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Coastdown Cheating Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested

state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

476.   Plaintiffs and Subclass members reasonably relied upon the Defendant's false misrepresentations.  They had no way of knowing that the Defendant's representations were false and gravely misleading.  As alleged herein, the Defendant engaged in extremely sophisticated methods of deception.  Plaintiffs and Subclass members did not, and could not, unravel the Defendant's deception on their own.

477.   The Defendant's actions as set forth above occurred in the conduct of trade or commerce.

478.   The Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

479.   The Defendant intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with an intent to mislead Plaintiffs and the Subclass.

480.   The Defendant knew or should have known that their conduct violated the Florida UDTPA.

481.   The Defendant owed Plaintiffs and the Subclass a duty to disclose the truth about their emissions systems manipulation because the Defendant:

a.    Possessed exclusive knowledge that they manipulated the fuel mileage tests;

b.    Intentionally concealed the foregoing from Plaintiffs and the Subclass; and/or

c.    Made incomplete representations that they manipulated the fuel mileage tests in the Coastdown Cheating Vehicles to turn off or limit effectiveness in normal driving conditions, while purposefully withholding material facts from Plaintiffs and the Subclass that contradicted these representations.

482.    The Defendant's conduct proximately caused injuries to Plaintiffs and the other Subclass members.

483.    Plaintiffs and the other Subclass members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendant's conduct in that Plaintiffs and the other Subclass members overpaid for their Coastdown Cheating Vehicles and did not receive the benefit of their bargain. These injuries are the direct and natural consequence of the Defendant's misrepresentations and omissions.

484.    The Defendant's violations present a continuing risk to Plaintiffs as well as to the general public.  The Defendant's unlawful acts and practices complained of herein affect the public interest.

485.   Accordingly, the Defendant is liable to Plaintiffs and Subclass members for damages in an amount to be proven at trial.

## COUNT 36

### VIOLATION OF THE HAWAII ACT § 480-2(A)
### (HAW. REV. STAT. § 480 *et seq.*)

486.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

487.   This claim is brought by Plaintiffs on behalf of Hawaii purchasers who are members of the Class.

488.   HAWAII REV. STAT. § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

489.   Ford is a "person" under HAW. REV. STAT. § 480-1.

490.   Plaintiffs and Hawaii Class members are "consumer[s]" as defined by HAW. REV. STAT. § 480-1, who purchased or leased the Coastdown Cheating Vehicles at issue.

491.   Pursuant to HAW. REV. STAT. § 480-13, Plaintiffs seek monetary relief against Ford measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

492.   Under HAW. REV. STAT. § 480-13.5, Plaintiffs seek an additional award against Ford of up to $10,000 for each violation directed at a Hawaii elder.

Ford knew or should have known that its conduct was directed to one or more Plaintiffs who are elders. Ford's conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder. Plaintiffs who are elders are substantially more vulnerable to Ford's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from Ford's conduct.

## COUNT 37

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT
### (IDAHO CODE ANN. § 48-601 *et seq.*)

493.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

494.   This claim is brought by Plaintiffs on behalf of Idaho purchasers who are members of the Class.

495.   The Idaho Consumer Protection Act (Idaho CPA) prohibits deceptive business practices, including but not limited to (1) representing that the Coastdown Cheating Vehicles have characteristics, uses, and benefits which they do not have; (2) representing that the Coastdown Cheating Vehicles are of a particular standard, quality, and grade when they are not; (3) advertising the Coastdown Cheating Vehicles with the intent not to sell them as advertised and certified; (4) engaging in

acts or practices which are otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce. *See* IDAHO CODE ANN. § 48-603.

496.   Ford is a "person" under IDAHO CODE ANN. § 48-602(1).

497.   Ford's acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under IDAHO CODE ANN. § 48-602(2).

498.   Pursuant to IDAHO CODE ANN. § 48-608, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1,000 for each plaintiff.

499.   Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

500.   Plaintiffs also seek punitive damages against Ford because its conduct evidences an extreme deviation from reasonable standards. Ford's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT 38**

**VIOLATION OF THE INDIANA
DECEPTIVE CONSUMER SALES ACT
(IND. CODE § 24-5-0.5-3)**

501.   Plaintiffs hereby incorporate by reference the allegations contained in
the preceding paragraphs of this complaint.

502.   This claim is included here for notice purposes only. Once the
statutory notice period has expired, Plaintiffs will amend their complaint to bring
this claim on behalf of Indiana purchasers who are members of the Class.

503.   Indiana's Deceptive Consumer Sales Act (Indiana DCSA) prohibits a
person from engaging in a "deceptive business practice[s]" or acts, including but
not limited to "(1) That such subject of a consumer transaction has sponsorship,
approval, performance, characteristics, accessories, uses, or benefits that they do
not have, or that a person has a sponsorship, approval, status, affiliation, or
connection it does not have; (2) That such subject of a consumer transaction is of a
particular standard, quality, grade, style or model, if it is not and if the supplier
knows or should reasonably know that it is not; . . . (7) That the supplier has a
sponsorship, approval or affiliation in such consumer transaction that the supplier
does not have, and which the supplier knows or should reasonably know that the
supplier does not have; . . . (b) Any representations on or within a product or its
packaging or in advertising or promotional materials which would constitute a

deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

504.  Ford is a "person" within the meaning of IND. CODE § 25-5-0.5-2(a)(2) and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

505.  Plaintiffs' vehicle purchases are "consumer transactions" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

506.  Pursuant to IND. CODE § 24-5-0.5-4, once the statutory notice period has expired, Plaintiffs will seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1,000 for Ford's willfully deceptive acts.

507.  Plaintiffs will also amend to seek punitive damages based on the outrageousness and recklessness of Ford's conduct.

508.  On June 20, 2019, Plaintiffs sent a letter complying with IND. CODE § 24-5-0.5-5(a) to Ford.

## COUNT 39

## VIOLATION OF THE IOWA PRIVATE RIGHT
## OF ACTION FOR CONSUMER FRAUDS ACT
## (IOWA CODE § 714h.1 *et seq.*)

509.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

510.   This claim is brought by Plaintiffs on behalf of Iowa purchasers who are members of the Class.

511.   The Iowa Private Right of Action for Consumer Frauds Act (Iowa CFA) prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

512.   Ford is a "person" under IOWA CODE § 714H.2(7).

513.   Plaintiffs and Iowa Class members are "consumers" as defined by IOWA CODE § 714H.2(3) who purchased or leased one or more Coastdown Cheating Vehicles.

514.   Pursuant to IOWA CODE § 714H.5, Plaintiffs seek an order enjoining Ford's unfair and/or deceptive acts or practices, actual damages, statutory damages up to three times the amount of actual damages awarded as a result of Ford's willful and wanton disregard for the rights of others, attorneys' fees, and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

## COUNT 40

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT
## (KAN. STAT. ANN. § 50-623 *et seq.*)

515.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

516.   This claim is brought by Plaintiffs on behalf of Kansas purchasers who are members of the Class.

517.   The Kansas Consumer Protection Act (Kansas CPA) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." KAN. STAT. ANN. § 50-626(a). Deceptive acts or practices include but are not limited to "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact" and "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." KAN. STAT. ANN. § 50-626.

518.   Plaintiffs and Kansas Class members are "consumers" within the meaning of KAN. STAT. ANN. § 50-624(b) who purchased or leased one or more Coastdown Cheating Vehicles.

519.   Each sale or lease of an Coastdown Cheating Vehicle to Plaintiffs was a "consumer transaction" within the meaning of KAN. STAT. ANN. § 50-624(c).

520.   Pursuant to KAN. STAT. ANN. § 50-634, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

521.   Plaintiffs also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under KAN. STAT. ANN. § 50-623 *et seq.*

## COUNT 41

## VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT (KY. REV. STAT. § 367.110 *ET SEQ.*).

522.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

523.   Plaintiffs bring this Count on behalf of the Kentucky Class members.

524.   Ford, Plaintiffs, and the Kentucky Class are "persons" within the meaning of the KY. REV. STAT. § 367.110(1).

525.    Ford engaged in "trade" or "commerce" within the meaning of KY.

REV. STAT. § 367.110(2).

526.    The Kentucky Consumer Protection Act (Kentucky CPA) makes

unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct

of any trade or commerce …." KY. REV. STAT. § 367.170(1). In the course of

Ford's business, it willfully failed to disclose and actively concealed the true

mileage of the Coastdown Cheating Vehicles, which is less than a reasonable

consumer would expect in light of Ford's advertising campaign, and that the

Coastdown Cheating Vehicles contained a mileage cheat device to continually

misrepresent the Coastdown Cheating Vehicles' mileage to the consumer.

Accordingly, Ford engaged in deceptive business practices prohibited by the

Kentucky CPA.

527.    In purchasing or leasing the Coastdown Cheating Vehicles, Plaintiffs

and the other Class members were deceived by Ford's misrepresentation of fuel

efficiency and inclusion of a mileage cheat device to continually misrepresent the

vehicle's fuel economy, as described above.

528.    Plaintiffs and Class members reasonably relied upon Ford's false

misrepresentations. They had no way of knowing that Ford's representations were

false and gravely misleading. As alleged herein, Ford engaged in extremely

sophisticated methods of deception. Plaintiffs and Class members did not, and could not, unravel Ford's deception on their own.

529.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

530.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

531.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with an intent to mislead Plaintiffs and the Class.

532.   Ford knew or should have known that its conduct violated the Kentucky CPA.

533.   Ford owed Plaintiffs and the Class a duty to disclose the truth about its mileage manipulation because Ford:

   a.   Possessed exclusive knowledge that it manipulated the fuel economy representations and created the mileage cheat device in the Coastdown Cheating Vehicles;

   b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

   c.   Made incomplete representations that it manipulated the mileage certifications in the Coastdown Cheating Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

534.   Ford had a duty to disclose the true mileage and the presence of a mileage cheat device in the Coastdown Cheating Vehicles, because Plaintiffs and

the other Class members relied on Ford's material representations that the

Coastdown Cheating Vehicles they were purchasing were fuel efficient, and free

from defects or a cheat device.

535.   Ford's conduct proximately caused injuries to Plaintiffs and the other

Class members.

536.   Plaintiffs and the other Class members were injured and suffered

ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of

Ford's conduct in that Plaintiffs and the other Class members overpaid for the

Coastdown Cheating Vehicles and did not receive the benefit of their bargain, and

their Coastdown Cheating Vehicles have suffered a diminution in value. These

injuries are the direct and natural consequence of Ford's misrepresentations and

omissions.

537.   Ford's violations present a continuing risk to Plaintiffs as well as to

the general public, in terms of continued misrepresentations, continued excess fuel

consumption, and continued increases in pollution, and therefore Ford's unlawful

acts and practices complained of herein affect the public interest.

538.   Pursuant to KY. REV. STAT. ANN. § 367.220, Plaintiffs and the Class

seek to recover actual damages in an amount to be determined at trial; declaratory

relief; attorneys' fees; and any other just and proper relief available under KY. REV.

STAT. ANN. § 367.220.

## COUNT 42

## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT
### (ME. REV. STAT. ANN. TIT. 5, § 205-A *et seq.*)

539.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

540.   This claim is brought by Plaintiffs on behalf of Maine purchasers who are members of the Class.

541.   The Maine Unfair Trade Practices Act (Maine UTPA) makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." ME. REV. STAT. ANN. TIT. 5, § 207.

542.   Ford, Plaintiffs, and Maine Class members are "persons" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(2).

543.   Ford is engaged in "trade" or "commerce" within the meaning of ME. REV. STAT. ANN. TIT. § 5, 206(3).

544.   Pursuant to ME. REV. STAT. ANN. TIT. 5, § 213, Plaintiffs seeks an order enjoining Ford's unfair and/or deceptive acts or practices.

545.   On June 20, 2019, Plaintiffs sent a letter complying with ME. REV. STAT. ANN. TIT. 5, § 213(1-A) to Ford. This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of Maine purchasers who are members of the Class.

## COUNT 43

## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT (MD. CODE ANN., COM. LAW § 13-101 *et seq.*)

546.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

547.   This claim is brought by Plaintiffs on behalf of Maryland purchasers who are members of the Class.

548.   The Maryland Consumer Protection Act (Maryland CPA) provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302.

549.   Ford, Plaintiffs, and Maryland Class members are "persons" within the meaning of MD. CODE ANN., COM. LAW § 13-101(h).

550.   Pursuant to MD. CODE ANN., COM. LAW § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT 44

## VIOLATION OF THE MASSACHUSETTS
## GENERAL LAW CHAPTER 93(A)
## (MASS. GEN. LAWS CH. 93A, § 1, *et seq.*)

551.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

552.   On June 20, 2019, Plaintiffs sent a letter complying with MASS. GEN. LAWS CH. 93A, § 9(3) to Ford.

## COUNT 45

## VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
## (MICH. COMP. LAWS § 445.903 *et seq.*)

553.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

554.   This claim is brought by Plaintiffs on behalf of Michigan purchasers who are members of the Class.

555.   The Michigan Consumer Protection Act (Michigan CPA) prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is"; or

"[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1). Ford failed to disclose that the Coastdown Cheating Vehicles do not have the advertised fuel economy, contain a mileage cheat device; and that fuel economy were far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

556.   Plaintiff and Michigan Class members are "person[s]" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d).

557.   Ford is a "person" engaged in "trade or commerce" within the meaning of the MICH. COMP. LAWS § 445.902(1)(d) and (g).

558.   Plaintiffs seek injunctive relief to enjoin Ford from continuing their unfair and deceptive acts; monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under MICH. COMP. LAWS § 445.911.

559.   Plaintiffs also seek punitive damages because Ford carried out despicable conduct with willful and conscious disregard of the rights of others. Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT 46**

**VIOLATION OF THE MINNESOTA**
**PREVENTION OF CONSUMER FRAUD ACT**
**(MINN. STAT. § 325F.68 *et seq.*)**

560.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

561.   This claim is brought by Plaintiffs on behalf of Minnesota purchasers who are members of the Class.

562.   The Minnesota Prevention of Consumer Fraud Act (Minnesota CFA) prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

563.   Each purchase or lease of an Coastdown Cheating Vehicle constitutes "merchandise" within the meaning of MINN. STAT. § 325F.68(2).

564.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

565.   Plaintiffs also seek punitive damages under MINN. STAT.

§ 549.20(1)(a) given the clear and convincing evidence that Ford's acts show

deliberate disregard for the rights of others.

## COUNT 47

### VIOLATION OF THE MINNESOTA
### DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48 *ET SEQ.*)

566.   Plaintiffs hereby incorporate by reference the allegations contained in

the preceding paragraphs of this complaint.

567.   This claim is brought by Plaintiffs on behalf of Minnesota purchasers

who are members of the Class.

568.   The Minnesota Deceptive Trade Practices Act (Minnesota DTPA)

prohibits deceptive trade practices, which include "[t]he act, use, or employment

by any person of any fraud, false pretense, false promise, misrepresentation,

misleading statement or deceptive practice, with the intent that others rely thereon

in connection with the sale of any merchandise, whether or not any person has in

fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

569.   Pursuant to MINN. STAT. § 8.31(3a), Plaintiffs seek actual damages,

attorneys' fees, and any other just and proper relief available under the Minnesota

CFA.

570.   Plaintiffs also seek punitive damages under MINN. STAT. § 549.20(1)(a) given the clear and convincing evidence that Ford's acts show deliberate disregard for the rights of others.

## COUNT 48

## VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT (MISS. CODE. ANN. § 75-24-1 *ET SEQ.*)

571.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

572.   This claim is brought by Plaintiffs on behalf of Mississippi purchasers who are members of the Class.

573.   The Mississippi Consumer Protection Act (Mississippi CPA) prohibits "unfair or deceptive trade practices in or affecting commerce." MISS. CODE ANN. § 75-24-5(1). Unfair or deceptive practices include but are not limited to "(e) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have"; "(g) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(i) Advertising goods or services with intent not to sell them as advertised and certified." MISS. CODE ANN. § 75-24-5(2).

574.   Plaintiffs seek actual damages in an amount to be determined at trial and any other just and proper relief available under the Mississippi CPA.

## COUNT 49

## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.010, *ET SEQ.*)

575.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

576.   This claim is brought by Plaintiffs on behalf of Missouri purchasers who are members of the Class.

577.   Defendants, Plaintiffs and the Missouri Class are "persons" within the meaning of MO. REV. STAT. § 407.010(5).

578.   Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of MO. REV. STAT. § 407.010(7).

579.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  MO. REV. STAT. § 407.020.  In the course of Defendants' business, it willfully failed to disclose and actively concealed that the NOx reduction system in the Affected Vehicles turns off or is limited during normal driving conditions,

that the Affected Vehicles emitted far more pollutants than gasoline powered

vehicles, that the Affected Vehicles emit far more pollution than a reasonable

consumer would expect in light of Defendants' advertising campaign, and that the

Affected Vehicles emitted unlawfully high levels of pollutants, including NOx, as

described above.  Accordingly, Defendants used or employed deception, fraud,

false pretense, false promise, misrepresentation, unfair practice or the concealment,

suppression, or omission of any material fact in connection with the sale or

advertisement of any merchandise in trade or commerce, in violation of the

Missouri MPA.  Ford's conduct offends public policy; is unethical, oppressive, or

unscrupulous; and presents a risk of, or causes, substantial injury to consumers.

580.   In the course of business, Ford willfully failed to disclose and actively

concealed the conduct discussed herein and otherwise engaged in activities with a

tendency or capacity to deceive. Ford also engaged in unlawful trade practices by

employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression, the use of a mileage cheat device, and/or omission of

any material fact with intent that others rely upon such concealment, suppression,

or omission, in connection with the sale of Coastdown Cheating Vehicles.

581.   Ford's unfair or deceptive acts or practices were likely to and did in

fact deceive reasonable consumers, including Plaintiffs and the other Missouri

Class members, about the true performance of the Coastdown Cheating Vehicles,

the lower fuel economy, the shorter range of the vehicle due to its lower fuel

economy, and the increased environmental impact of Ford vehicles, and the true

value of the Coastdown Cheating Vehicles.

582.   Ford intentionally and knowingly misrepresented material facts

regarding the Coastdown Cheating Vehicles with intent to mislead Plaintiffs and

the Missouri Class.

583.   Ford knew or should have known that their conduct violated the

Missouri MPA.

584.   Ford owed Plaintiffs and Missouri Class members a duty to disclose

the performance, fuel mileage, and true environmental impact of the Coastdown

Cheating Vehicles, because Ford:

> a.   Possessed exclusive knowledge that they were selling and
> distributing Coastdown Cheating Vehicles throughout the
> United States that did not perform as advertised and contained a
> mileage cheat device;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the
> Missouri Class; and/or
>
> c.   Made incomplete representations about the environmental
> friendliness, fuel mileage, towing capacity, and performance of
> the Coastdown Cheating Vehicles while purposefully
> withholding material facts from Plaintiffs and the Missouri
> Class that contradicted these representations.

585.   Because Ford fraudulently concealed the lower mileage of the

Coastdown Cheating Vehicles, the value of the Coastdown Cheating Vehicles has

greatly diminished. In light of the stigma attached to the Coastdown Cheating

Vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

586.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Plaintiffs and the Missouri Class.

587.   Plaintiffs and the Missouri Class suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Class members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Missouri MPA.

588.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Missouri MPA. All owners of Coastdown Cheating Vehicles suffered ascertainable loss in the form of the diminished value of their vehicle as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

589.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

590.   As a direct and proximate result of Ford's violations of the Missouri MPA, Plaintiffs and the Missouri Class have suffered injury-in-fact and/or actual damage.

591.   Plaintiffs seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for Ford's knowing violations of the Missouri MPA, and any other just and proper relief available under the Missouri MPA.

## COUNT 50

### VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973 (MONT. CODE ANN. § 30-14-101 *et seq.*)

592.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

593.   This claim is brought by Plaintiffs on behalf of Montana purchasers who are members of the Class.

594.   The Montana Unfair Trade Practices and Consumer Protection Act (Montana CPA) makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MONT. CODE ANN. § 30-14-103.

595.   Ford, Plaintiffs, and Montana Class members are "persons" within the meaning of MONT. CODE ANN. § 30-14-102(6).

596.    Plaintiffs and Montana Class members are "consumer[s]" under MONT. CODE ANN. § 30-14-102(1).

597.    The sale or lease of each Coastdown Cheating Vehicle at issue occurred within "trade and commerce" within the meaning of MONT. CODE ANN. § 30-14-102(8), and Ford committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

598.    Because Ford's unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from Ford: the greater of actual damages or $500; discretionary treble damages; and reasonable attorneys' fees.

599.    Plaintiffs additionally seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under MONT. CODE ANN. § 30-14-133.

## COUNT 51

### VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT (NEV. REV. STAT. § 598.0903 *et seq.*)

600.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

601.    This claim is brought by Plaintiffs on behalf of Nevada purchasers who are members of the Class.

602.    The Nevada Deceptive Trade Practices Act (Nevada DTPA) prohibits
deceptive trade practices. NEV. REV. STAT. § 598.0915 provides that a person
engages in a "deceptive trade practice" if, in the course of business or occupation,
the person "[k]nowingly makes a false representation as to the characteristics,
ingredients, uses, benefits, alterations or quantities of goods or services for sale or
lease or a false representation as to the sponsorship, approval, status, affiliation or
connection of a person therewith"; "[r]epresents that goods or services for sale or
lease are of a particular standard, quality or grade, or that such goods are of a
particular style or model, if he or she knows or should know that they are of
another standard, quality, grade, style or model"; "[a]dvertises goods or services
with intent not to sell or lease them as advertised and certified"; or "[k]nowingly
makes any other false representation in a transaction." NEV. REV. STAT.
§§ 598.0915–598.0925. Ford failed to disclose that the Coastdown Cheating
Vehicles did not have the advertised and certified fuel economy and also contained
a mileage cheat device to continually misrepresent the mileage to the consumer;
and (4) that the fuel economy was far worse than a reasonable consumer would
expect given the premium paid for these vehicles over a comparable vehicle.

603.    Accordingly, Plaintiffs seek their actual damages, punitive damages,
an order enjoining Ford's deceptive acts or practices, costs of Court, attorney's

fees, and all other appropriate and available remedies under the Nevada DTPA.

NEV. REV. STAT. § 41.600.

## COUNT 52

### VIOLATION OF THE NEW HAMPSHIRE
### CONSUMER PROTECTION ACT
### (N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)

604.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

605.   This claim is brought by Plaintiffs on behalf of New Hampshire purchasers who are members of the Class.

606.   The New Hampshire Consumer Protection Act (New Hampshire CPA) prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including "but . . . not limited to, the following: . . . [r]epresenting that goods or services have . . . characteristics, . . . uses, benefits, or quantities that they do not have"; "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another"; and "[a]dvertising goods or services with intent not to sell them as advertised and certified." N.H. REV. STAT. § 358-A:2.

607.   Ford, Plaintiffs, and New Hampshire Class members are "persons" under N.H. REV. STAT. ANN. § 358-A:1.

608.   Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. REV. STAT. ANN. § 358-A:1.

609.   Because Ford's willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiff seeks recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining Ford's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

## COUNT 53

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT (N.J. STAT. ANN. § 56:8-1 *ET SEQ.*)

610.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

611.   This claim is brought by Plaintiffs on behalf of New Jersey purchasers who are members of the Class.

612.   The New Jersey Consumer Fraud Act (New Jersey CFA) makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real

estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2. Ford failed to disclose that the Coastdown Cheating Vehicles do not have the advertised and certified fuel efficiency, and in fact contain a mileage cheat device that continually misrepresents the mileage of the vehicle to the user. The Coastdown Cheating Vehicles' fuel economy are far worse than a reasonable consumer would expect given the premium paid for these vehicles over other vehicles.

613.   Ford, Plaintiffs, and New Jersey Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d).

614.   Ford engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

615.   Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Ford's unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

## COUNT 54

### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### (N.Y. GEN. BUS. LAW §§ 349–350)

616.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

617.    This claim is brought by Plaintiffs on behalf of New York purchasers who are members of the Class.

618.    The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349.

619.    Plaintiffs and New York Class members are "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

620.    Ford is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

621.    Ford's deceptive acts and practices, which were intended to mislead consumers who purchased or leased a Coastdown Cheating Vehicle, was conduct directed at consumers.

622.    Because Ford's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Ford's deceptive conduct; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

## COUNT 55

## VIOLATION OF THE NEW MEXICO
## UNFAIR TRADE PRACTICES ACT
## (N.M. STAT. ANN. § 57-12-1 *et seq.*)

623.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

624.   This claim is brought by Plaintiffs on behalf of New Mexico purchasers who are members of the Class.

625.   The New Mexico Unfair Trade Practices Act (New Mexico UTPA) makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services . . . by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D). Ford failed to disclose that the Coastdown Cheating Vehicles did not have the advertised and certified fuel economy and also contained a mileage cheat device to continually misrepresent their fuel economy to the driver; and that the fuel economy was far worse than a reasonable consumer would expect given the premium paid for these vehicles over a comparable vehicle.

626.   Ford, Plaintiffs, and New Mexico Class members are "person[s]" under N.M. STAT. ANN. § 57-12-2.

627.   Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. STAT. ANN. § 57-12-2.

628.   Because Ford's unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

## COUNT 56

### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1 *et seq.*)

629.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

630.   This claim is brought by Plaintiffs on behalf of North Carolina purchasers who are members of the Class.

631.   North Carolina's Unfair and Deceptive Acts and Practices Act (the North Carolina Act) broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

632.   Ford engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

633.   Plaintiffs seek an order for treble his actual damages, an order enjoining Ford's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. GEN. STAT. § 75-16.

## COUNT 57

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT (N.D. CENT. CODE § 51-15-02)

634.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

635.   This claim is brought by Plaintiffs on behalf of North Dakota purchasers who are members of the Class.

636.   The North Dakota Consumer Fraud Act (North Dakota CFA) makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise." N.D. CENT. CODE § 51-15-02.

637.   Ford, Plaintiffs, and North Dakota Class members are "persons" within the meaning of N.D. CENT. CODE § 51-15-02(4).

638.   Ford engaged in the "sale" of "merchandise" within the meaning of N.D. CENT. CODE § 51-15-02(3), (5).

639.   Ford knowingly committed the conduct described above and

therefore, under N.D. CENT. CODE § 51-15-09, Ford is liable to Plaintiffs for treble

damages in amounts to be proven at trial, as well as attorneys' fees, costs, and

disbursements. Plaintiffs further seek an order enjoining Ford's unfair and/or

deceptive acts or practices, and other just and proper available relief under the

North Dakota CFA.

## COUNT 58

## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT
## (OKLA. STAT. TIT. 15, § 751 *et seq.*)

640.   Plaintiffs hereby incorporate by reference the allegations contained in

the preceding paragraphs of this complaint.

641.   This claim is brought by Plaintiffs on behalf of Oklahoma purchasers

who are members of the Class.

642.   The Oklahoma Consumer Protection Act (Oklahoma CPA) declares

unlawful, *inter alia*, the following acts or practices when committed in the course

of business: making a "misrepresentation, omission or other practice that has

deceived or could reasonably be expected to deceive or mislead a person to the

detriment of that person" and "any practice which offends established public policy

or if the practice is immoral, unethical, oppressive, unscrupulous or substantially

injurious to consumers." OKLA. STAT. TIT. 15, §§ 752–753.

643.   Plaintiffs and Oklahoma Class members are "persons" under OKLA. STAT. TIT. 15, § 752.

644.   Ford is a "person," "corporation," or "association" within the meaning of OKLA. STAT. TIT. 15, § 15-751(1).

645.   The sale or lease of an Coastdown Cheating Vehicle to Plaintiffs was a "consumer transaction" within the meaning of OKLA. STAT. TIT. 15, § 752 and Ford's actions as set forth herein occurred in the conduct of trade or commerce.

646.   Ford's acts were made knowingly, intentionally, and with malice. Ford demonstrated a complete lack of care and were in reckless disregard for the rights of Plaintiffs and the other Class members. Plaintiffs and the other Class members are therefore entitled to an award of punitive damages to the extent permitted under applicable law.

647.   Ford's conduct as alleged herein was unconscionable because (1) Ford, knowingly or had reason to know, took advantage of consumers reasonably unable to protect their interests because of their ignorance of Ford's fraudulent omissions and representations; (2) at the time the consumer transaction was entered into, Ford knew or had reason to know that the price the consumers were charged grossly exceeded the price at which they would have paid if they had known of the Ford's scheme, and (3) Ford knew or had reason to know that the

transaction it induced the consumers to enter into was excessively one-sided in favor of Ford.

648.   Because Ford's unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiffs further seek an order enjoining Ford's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT 59

### VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (OR. REV. STAT. § 646.605 *et seq.*)

649.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

650.   This claim is brought by Plaintiffs on behalf of Oregon purchasers who are members of the Class.

651.   The Oregon Unfair Trade Practices Act (Oregon UTPA) prohibits a person from, in the course of the person's business, doing any of the following: representing that goods have characteristics uses, benefits, or qualities that they do not have; representing that goods are of a particular standard or quality if they are of another; advertising goods or services with intent not to provide them as advertised and certified; and engaging in any other unfair or deceptive conduct in

trade or commerce. OR. REV. STAT. § 646.608(1). Ford failed to disclose that the

Coastdown Cheating Vehicles do not have the advertised and certified fuel

economy; and (4) that emissions and fuel economy were far worse than a

reasonable consumer would expect given the premium paid for these vehicles over

a comparable vehicle.

652.   Ford is a person within the meaning of OR. REV. STAT. § 646.605(4).

653.   Each Coastdown Cheating Vehicle is a "good" obtained primarily for

personal family or household purposes within the meaning of OR. REV. STAT.

§ 646.605(6).

654.   Plaintiffs are entitled to recover the greater of actual damages or $200

pursuant to OR. REV. STAT. § 646.638(1). Plaintiffs are also entitled to punitive

damages because Ford engaged in conduct amounting to a particularly aggravated,

deliberate disregard of the rights of others.

## COUNT 60

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 PA. CONS. STAT. § 201-1 *ET SEQ.*)

655.   Plaintiffs hereby incorporate by reference the allegations contained in

the preceding paragraphs of this complaint.

656.   This claim is brought by Plaintiffs on behalf of Pennsylvania

purchasers who are members of the Class.

657.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law (Pennsylvania CPL) prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised and certified; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 PA. CONS. STAT. § 201-2(4).

658.   Ford, Plaintiffs, and Pennsylvania Class members are "persons" within the meaning of 73 PA. CONS. STAT. § 201-2(2).

659.   Plaintiffs purchased a Coastdown Cheating Vehicle primarily for personal, family, or household purposes within the meaning of 73 PA. CONS. STAT. § 201-9.2.

660.   All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 PA. CONS. STAT. § 201-2(3).

661.   Ford is liable to Plaintiffs and the Pennsylvania Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 PA. CONS. STAT. § 201-9.2(a). Plaintiffs and the Pennsylvania Class are also entitled to an award of punitive damages given that Ford's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 61

## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### (R.I. GEN. LAWS § 6-13.1 *et seq.*)

662.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

663.   This claim is brought by Plaintiffs on behalf of Rhode Island purchasers who are members of the Class.

664.   Rhode Island's Unfair Trade Practices and Consumer Protection Act (Rhode Island CPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce," including "[e]ngaging in any act or practice that is unfair or deceptive to the consumer" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. GEN. LAWS § 6-13.1-1(6).

665.   Ford, Plaintiffs, and Rhode Island Class members are "persons" within the meaning of R.I. GEN. LAWS § 6-13.1-1(3).

666.   Ford was engaged in "trade" and "commerce" within the meaning of R.I. GEN. LAWS § 6-13.1-1(5).

667.   Plaintiffs purchased or leased Coastdown Cheating Vehicles primarily for personal, family, or household purposes within the meaning of R.I. GEN. LAWS § 6-13.1-5.2(a).

668.   Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. GEN. LAWS § 6-13.1-5.2(a). Plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT 62

### VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT
### (TENN. CODE § 47-18-101, *et seq.*)

669.   Plaintiffs incorporate by reference all paragraphs alleged herein.

670.   This claim is brought by Plaintiffs on behalf of Tennessee purchasers who are members of the Class.

671.   Plaintiffs and the Tennessee Class are "natural persons" and "consumers" within the meaning of TENN. CODE § 47-18-103(2).

672.   Ford is a "person" within the meaning of TENN. CODE § 47-18-103(2).

673.   Ford's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE § 47-18-103(19).

674.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have . . . characteristics, [or] . . . benefits . . . that they do not have . . . ."; "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another"; and "Advertising goods or services with intent not to sell them as advertised." TENN. CODE § 47-18-104. BMW NA and BMW AG

violated the Tennessee CPA by engaging in unfair or deceptive acts, including

representing that Affected Vehicles have characteristics or benefits that they did

not have; representing that Affected Vehicles are of a particular standard, quality,

or grade when they are of another; and advertising Affected Vehicles with intent

not to sell them as advertised.

675.   In the course of business, Ford willfully failed to disclose and actively

concealed the conduct discussed herein and otherwise engaged in activities with a

tendency or capacity to deceive. Ford also engaged in unlawful trade practices by

employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression, the use of a mileage cheat device, and/or omission of

any material fact with intent that others rely upon such concealment, suppression,

or omission, in connection with the sale of Coastdown Cheating Vehicles.

676.   Ford's unfair or deceptive acts or practices were likely to and did in

fact deceive reasonable consumers, including Plaintiffs and the other Tennessee

Class members, about the true performance of the Coastdown Cheating Vehicles,

the lower fuel economy, the shorter range of the vehicle due to its lower fuel

economy, and the increased environmental impact of Ford vehicles, and the true

value of the Coastdown Cheating Vehicles.

677.   Ford intentionally and knowingly misrepresented material facts regarding the Coastdown Cheating Vehicles with intent to mislead Plaintiffs and the Tennessee Class.

678.   Ford knew or should have known that their conduct violated the Tennessee CPA.

679.   Ford owed Plaintiffs and Tennessee Class members a duty to disclose the performance, fuel mileage, and true environmental impact of the Coastdown Cheating Vehicles, because Ford:

  a.    Possessed exclusive knowledge that they were selling and distributing Coastdown Cheating Vehicles throughout the United States that did not perform as advertised and contained a mileage cheat device;

  b.    Intentionally concealed the foregoing from Plaintiffs and the Tennessee Class; and/or

  c.    Made incomplete representations about the environmental friendliness, fuel mileage, towing capacity, and performance of the Coastdown Cheating Vehicles while purposefully withholding material facts from Plaintiffs and the Tennessee Class that contradicted these representations.

680.   Because Ford fraudulently concealed the lower mileage of the Coastdown Cheating Vehicles, the value of the Coastdown Cheating Vehicles has greatly diminished. In light of the stigma attached to the Coastdown Cheating Vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

681.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Plaintiffs and the Tennessee Class.

682.   Plaintiffs and the Tennessee Class suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Class members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Tennessee CPA.

683.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Tennessee CPA. All owners of Coastdown Cheating Vehicles suffered ascertainable loss in the form of the diminished value of their vehicle as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

684.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

685.   As a direct and proximate result of Ford's violations of the Tennessee CPA, Plaintiffs and the Tennessee Class have suffered injury-in-fact and/or actual damage.

686.   Pursuant to TENN. CODE § 47-18-109(a), Plaintiffs, individually and on behalf of the other Class members, seeks monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages as a result of Ford's willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT 63

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT (TEX. BUS. & COM. CODE § 17.4 *ET SEQ.*)

687.   Plaintiffs incorporate by reference all paragraphs alleged herein.

688.   This claim is brought by Plaintiffs on behalf of Texas purchasers who are members of the Class.

689.   Plaintiffs and the Texas Class members are individuals with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* TEX. BUS. & COM. CODE § 17.41.

690.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading, or deceptive act or practice specifically enumerated in TEX. BUS. & COM. CODE § 17.46(b); or (ii) "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3). The Texas DTPA declares

several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have"; "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(9) advertising goods or services with intent not to sell them as advertised." An "unconscionable action or course of action" means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE § 17.45(5). As detailed herein, Ford has engaged in an unconscionable action or course of action and thereby caused economic damages to the Texas Class.

691.   In the course of business, Ford willfully failed to disclose and actively concealed the conduct discussed herein and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, the use of a mileage cheat device, and/or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of Coastdown Cheating Vehicles.

692.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Texas Class

members, about the true performance of the Coastdown Cheating Vehicles, the

lower fuel economy, the shorter range of the vehicle due to its lower fuel economy,

and the increased environmental impact of Ford vehicles, and the true value of the

Coastdown Cheating Vehicles.

693.   Ford intentionally and knowingly misrepresented material facts

regarding the Coastdown Cheating Vehicles with intent to mislead Plaintiffs and

the Texas Class.

694.   Ford knew or should have known that their conduct violated the Texas

DTPA.

695.   Ford owed Plaintiffs and Texas Class members a duty to disclose the

performance, fuel mileage, and true environmental impact of the Coastdown

Cheating Vehicles, because Ford:

> a.   Possessed exclusive knowledge that they were selling and distributing Coastdown Cheating Vehicles throughout the United States that did not perform as advertised and contained a mileage cheat device;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Texas Class; and/or
>
> c.   Made incomplete representations about the environmental friendliness, fuel mileage, towing capacity, and performance of the Coastdown Cheating Vehicles while purposefully withholding material facts from Plaintiffs and the Texas Class that contradicted these representations.

696.   Because Ford fraudulently concealed the lower mileage of the

Coastdown Cheating Vehicles, the value of the Coastdown Cheating Vehicles has

greatly diminished. In light of the stigma attached to the Coastdown Cheating Vehicles by Ford's conduct, they are now worth significantly less than they otherwise would be.

697.   Ford's omissions and/or misrepresentations about the fuel consumption of the Coastdown Cheating Vehicles were material to Plaintiffs and the Texas Class.

698.   Plaintiffs and the Texas Class suffered ascertainable loss caused by Ford's misrepresentations and their concealment of and failure to disclose material information. Class members who purchased the Coastdown Cheating Vehicles either would have paid less for their vehicles or would not have purchased or leased them at all but for Ford's violations of the Texas DTPA.

699.   Ford had an ongoing duty to all Ford customers to refrain from unfair and deceptive practices under the Texas DTPA. All owners of Coastdown Cheating Vehicles suffered ascertainable loss in the form of the diminished value of their vehicle as a result of Ford's deceptive and unfair acts and practices made in the course of Ford's business.

700.   Ford's violations present a continuing risk to Plaintiffs as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

701.   As a direct and proximate result of Ford's violations of the Texas DTPA, Plaintiffs and the Texas Class have suffered injury-in-fact and/or actual damage.

702.   On June 20, 2019, Plaintiffs sent a letter complying with TEX. BUS. & COM. CODE Ann. § 17.505 to Ford.

703.   Plaintiffs seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, treble damages for Ford's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

704.   Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), Plaintiffs are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from Plaintiffs based on violations of the Texas DTPA or which the Court deems proper.

## COUNT 64

## VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
## (UTAH CODE ANN. § 13-11-1 *ET SEQ.*)

705.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

706.   This claim is brought by Plaintiffs on behalf of Utah purchasers who are members of the Class.

707. The Utah Consumer Sales Practices Act (Utah CSPA) makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including but not limited to indicating that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if it has not; indicating that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not; and "indicat[ing] that a specific price advantage exists, if it does not." UTAH CODE ANN. § 13-11-4.

708. Ford knew, or had reason to know, that consumers would rely on their failure to disclose the defects in its emissions system. Ford therefore engaged in an unconscionable act within the meaning of UTAH CODE ANN. § 13-11-5.

709. Pursuant to UTAH CODE ANN. § 13-11-4, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

## COUNT 65

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
### (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

710. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

711.   This claim is brought by Plaintiffs on behalf of Vermont purchasers who are members of the Class.

712.   The Vermont Consumer Fraud Act (Vermont CFA) makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." VT. STAT. ANN. TIT. 9, § 2453(a).

713.   Ford was a seller within the meaning of VT. STAT. ANN. TIT. 9, § 2451(a)(c).

714.   Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to VT. STAT. ANN. TIT. 9, § 2461(b).

## COUNT 66

### VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT (VA. CODE ANN. § 59.1-196 *et seq.*)

715.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

716.   This claim is brought by Plaintiffs on behalf of Virginia purchasers who are members of the Class.

717.   The Virginia Consumer Protection Act (Virginia CPA) lists prohibited "practices," which include "[u]sing any other deception, fraud, false pretense, false

promise, or misrepresentation in connection with a consumer transaction." VA. CODE ANN. § 59.1-200.

718.   Ford is a "supplier" under VA. CODE ANN. § 59.1-198.

719.   Each sale and lease of a Coastdown Cheating Vehicle was a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

720.   Pursuant to VA. CODE ANN. § 59.1-204, Plaintiffs seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff. Because Ford's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

721.   Plaintiffs also seek an order enjoining Ford's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under VA. CODE ANN. § 59.1-204 *et seq.*

## COUNT 67

### VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (WASH. REV. CODE ANN. § 19.86.010 *et seq.*)

722.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

723.   This claim is brought by Plaintiffs on behalf of Washington purchasers who are members of the Class.

724.   The Washington Consumer Protection Act (Washington CPA) broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE ANN. § 19.96.010.

725.   Ford committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE ANN. § 19.96.010.

726.   Ford is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE ANN. § 19.86.090.

## COUNT 68

### VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT (W. VA. CODE § 46A-1-101 *et seq.*)

727.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

728.   This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of West Virginia purchasers who are members of the Class.

729. Ford is a "person" under W. VA. CODE § 46A-1-102(31).

730. Plaintiffs and West Virginia Class members are "consumers" as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Coastdown Cheating Vehicles.

731. Ford engaged in trade or commerce as defined by W. VA. CODE § 46A-6-102(6).

732. The West Virginia Consumer Credit and Protection Act (West Virginia CCPA) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include:

(I) Advertising goods or services with intent not to sell them as advertised and certified; . . .

(L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; [and]

(N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised and certified, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to

> state material information which is necessary to make the
> statements therein not false, misleading or deceptive.

W. VA. CODE § 46A-6-102(7).

733. Pursuant to W. VA. CODE § 46A-6-106, once the statutory notice period has expired, Plaintiffs will amend to seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

734. Plaintiffs will also amend to seek punitive damages against Ford because it carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiffs to cruel and unjust hardship as a result.

735. Plaintiffs further seek an order enjoining Ford's unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

736. On June 20, 2019, Plaintiffs sent a letter complying with W. VA. CODE § 46A-6-106(b) to Ford. This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of West Virginia purchasers who are members of the Class.

## COUNT 69

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. § 40-12-105 *et seq.*)

737.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

738.  This claim is included here for notice purposes only. Once the statutory notice period has expired, Plaintiffs will amend their complaint to bring this claim on behalf of Wyoming purchasers who are members of the Class.

739.  Pursuant to WYO. STAT. § 40-12-108(a), once the statutory notice period has expired, Plaintiffs will amend to seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, in addition to any other just and proper relief available under the Wyoming CPA.

740.  On June 20, 2019, Plaintiffs sent a letter complying with WYO. STAT. § 45-12-109 to Ford. If Ford fails to remedy their unlawful conduct, Plaintiffs will seek all damages and relief to which Plaintiffs are entitled.

741.  Notice pursuant to: Alabama Code § 8-19-10(e); Alaska Statutes § 45.50.535; California Civil Code § 1782; Georgia Code § 10-1-399; Indiana Code § 24-5-0.5-5(a); Maine Revised Statutes, Title 5, § 50-634(g); Massachusetts General Laws Chapter 93A, § 9(3); Texas Business & Commercial Code § 17.505; West Virginia Code § 46A-6-106(b); and Wyoming Statutes § 40-12-109 was sent to Ford on June 20, 2019.

## COUNT 70

## BREACH OF EXPRESS WARRANTY

742.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

743.   Defendant was a merchant with respect to motor vehicles.

744.   In selling its vehicles, Ford expressly warranted in advertisements, including in the stickers affixed to the windows of its vehicles, that its vehicles provided a favorable fuel economy of specific MPGs, depending on the vehicle.

745.   These affirmations and promises were part of the basis of the bargain between the parties.

746.   Defendant breached these warranties arising from its advertisements, including window stickers, because the fuel economy ratings for its vehicles were inaccurate.

747.   As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and members of the Class have been damaged in an amount to be determined at trial.

## COUNT 71

## FRAUD

748.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

749.   Defendant affirmatively misrepresented and concealed material facts concerning the fuel economy of its vehicles.

750.   Defendant had a duty to disclose the true fuel economy based on its superior knowledge and affirmative misrepresentations to the contrary.

751.   Defendant affirmatively misrepresented and/or actively concealed material facts, in whole or in part, intending to induce Plaintiffs and members of the Class to purchase their vehicles and at a higher price than they otherwise would have.

752.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

## COUNT 72

## NEGLIGENT MISREPRESENTATION

753.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

754.   Defendant made fuel economy representations to Plaintiffs and members of the Class that were not true.

755.   Defendant had no reasonable grounds for believing these representations were true when they made them, yet they intended that Plaintiffs and Class members rely on these misrepresentations.

756.    Plaintiff reasonably relied on Defendant's representations and as a result Plaintiff and Class member were harmed.

## COUNT 73

## UNJUST ENRICHMENT

757.    Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

758.    Because of Ford's wrongful acts and omissions, Ford charged a higher price for its vehicles than the vehicles' true value and Ford obtained monies which rightfully belong to Plaintiffs.

759.    Defendant enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

760.    Plaintiffs, therefore, seek an order requiring Ford to make restitution to them and other members of the Class.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.      Determine this action may be maintained as a Class action with respect to the Class and certify it as such under Rule 23(b)(3), or alternatively certify all

issues and claims that are appropriately certified, and designate and appoint Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.     Declare, adjudge, and decree the conduct of the Defendant as alleged herein to be unlawful, unfair, and deceptive;

C.     Notify all Class members about the lower fuel economy ratings and higher emissions at Ford's expense and provide correct fuel economy and emissions ratings;

D.     Award Plaintiffs and Class members restitution of all monies paid to Defendant as a result of unlawful, deceptive, and unfair business practices;

E.     Award Plaintiffs and Class members actual, compensatory damages as proven at trial;

F.     Award Plaintiffs and Class members reasonable attorneys' fees, costs, and pre- and post-judgment interest;

G.     Restitution, including at the election of Class members, recovery of the purchase price of their Coastdown Cheating Vehicles, or the overpayment or diminution in value of their Coastdown Cheating Vehicles; and

H.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: August 16, 2019   Respectfully Submitted,

            By: */s/ Steve W. Berman*
            Steve W. Berman
            HAGENS BERMAN SOBOL SHAPIRO LLP
            1301 Second Avenue, Suite 2000
            Seattle, WA 98101
            Telephone: (206) 623-7292
            Facsimile: (206) 623-0594
            steve@hbsslaw.com

            Robert C. Hilliard
            HILLIARD MARTINEZ GONZALES LLP
            719 S. Shoreline Boulevard
            Corpus Christi, Texas 78401
            Telephone No.: (361) 882-1612
            Facsimile No.: (361) 882-3015
            hmgservice@hmglawfirm.com

            Jeffrey S. Goldenberg
            GOLDENBERG SCHNEIDER, L.P.A.
            One West 4th Street, 18th Floor
            Cincinnati, OH 45202
            Telephone: (513) 345-8291
            Facsimile: (513) 345-8294
            jgoldenberg@gs-legal.com

            Jason Thompson
            SOMMERS SCHWARTZ, P.C.
            One Tower Square, Suite 1700
            Southfield, MI  48076
            Telephone No.: (248) 355-0300
            jthompson@sommerspc.com

            *Counsel for Plaintiffs*